**In re Dale G. ALVSTAD, Debtor.**

**Bankruptcy No. 97–31836.**

United States Bankruptcy Court,
D. North Dakota.

Aug. 4, 1998.

James J. Coles, Bismarck, ND, for Debtor.

Shon Hastings, Fargo, ND, for USA/FSA/RHS/IRS.

Wayne Drewes, Fargo, ND, trustee.

### MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The debtor, Dale G. Alvstad ("Dale"), filed his voluntary petition for relief under Chapter 12 of the United States Bankruptcy Code ("Code") on December 8, 1997. His First Amended Chapter 12 Plan of Reorganization ("Amended Plan"), filed on June 8, 1998, is now before the Court for confirmation. The United States of America, acting on behalf of Farm Service Agency ("FSA"), Rural Housing Service ("RHS"), and the Internal Revenue Service ("IRS"), filed an objection to confirmation on June 18, 1998, based principally upon grounds of feasibility. On June 22, 1998, a confirmation hearing was held, at which time this matter was taken under ad-

---

1. In Schedule A, Dales lists the description and location of his farmland as follows:
 157–88–Sec.29–N1/2; 157–88–Sec.30–NE1/4SW1/4, 2, 3, E1/2NW1/4, N1/2SE1/4, NE1/4; 156–89–Sec. 13

2. As background information, the Court notes that CCC is "a body corporate ... [and] an agency and instrumentality of the United States within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture," which was created in 1948 for the purpose of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance and balanced and adequate supplies of agricultural commodities ... and of facilitating the orderly distribution of agricultural commodities[.]" 15 U.S.C.A. § 714 (West 1998). The Agriculture Stabilization and Conservation Service acts on behalf of CCC to administer government farm programs thereunder, such as the CRP, which arises pursuant to 16 U.S.C.A. §§ 3831–3843 (West 1998).

visement and both parties were allowed ten days within which to file post-hearing briefs in support of their respective positions. Turning to the issues presented, the Court now makes the following determinations:

## I. FACTS

### 1. Background

Dale is a divorced father of three children, all of whom have reached the age of majority. He lives alone for the most part, although the youngest of his children, his 18–year–old daughter, occasionally resides with him.

Dale has been a farmer for an undisclosed number of years in or near Blaisdell, North Dakota, farming an unspecified acreage of farm real property, which he values at $196,300.00.[1] At present, he does not actively farm the land himself; rather, he hopes to cash rent the vast majority of it to another farmer in the region for annual payments of $18,000.00. As of the June 22 hearing, Dale had not entered into a written lease agreement with his anticipated lessee.

Dale furloughs his remaining acreage, which has been identified as consisting of 115 acres, under the Conservation Reserve Program ("CRP") pursuant to ten-year executory contracts with the Commodity Credit Corporation ("CCC"), which are now nearly completed.[2] Under the contracts, he is enti-

---

Under the CRP, the Secretary of Agriculture is charged with formulating and carrying out "the enrollment of lands in a conservation reserve program through the use of contracts to assist owners and operators of [eligible] lands ... to conserve and improve the soil and water resources of such lands." 16 U.S.C.A. § 3831(a) (West 1998). By entering the CRP program, eligible producers agree to convert eligible land to a conserving use for the duration of their contracts in return for annual rental payments and cost-share assistance from CCC. 7 C.F.R. § 1410.101 (1997). Currently, contracts under the program endure for "not less than 10, nor more than 15, years." 16 U.S.C.A. § 3831(e)(1) (West 1998). Generally, CRP rental payments are made in cash or in-kind payments. 16 U.S.C.A. § 3834(d) (West 1998). Otherwise, payments made under the CCC may be made in cash, in-kind, in commodity certificates, or any combination thereof. 7 C.F.R. pt. 704.17 (1997).

tled to receive a single remaining payment of $4,616.00 in Fall 1998. After the expiration of the contracts, Dale intends to cash rent this land for annual payments of at least $3,800.00. At the time of the June 22 hearing, Dale made no indication that he had either identified a lessee, or entered into a lease agreement, for this real property.[3]

In order to earn off-farm income, Dale maintains some level of employment, be it part- or full-time, as a plumber in Minot, North Dakota. He estimates his average income from this employment to be $12,000.00 annually. As he does not possess a driver's license, he depends upon one of his daughters, or his cousin, variously, to transport him to his workplace.

### 2. Claims of Creditors

After Dale filed his Chapter 12 petition on December 8, 1997, numerous proofs of claim were filed in his bankruptcy case on behalf of, inter alia, various federal agencies, county governmental bodies, and individual creditors. Those claims now relevant to the instant matter are discussed below.

The IRS filed an initial proof of claim on December 12, 1997. On January 8, 1998, it filed an amended proof of claim in the amount of $151,198.25, comprised of both an unsecured priority claim of $500.00, and an unsecured nonpriority claim of $150,698.25.

On February 9, 1998, FSA filed a proof of claim in the amount of $190,459.62, secured by a first lien on Dale's real property, and by a perfected security interest in various items of Dale's chattel—consisting of livestock, vehicles, and farm equipment—having an aggregate value of $16,000.00. FSA attached copies of the loan documents evincing the debt, as well as copies of its perfected security interests in Dale's property, to its claim.

On February 13, 1998, RHS filed a proof of claim in the amount of $72,064.65 secured by a second lien in Dale's farm real property. RHS similarly attached copies of the loan documents evincing the debt, as well as copies of its perfected security interests in Dale's property, to its claim.

The Clerk of the District Court for Mountrail County, North Dakota ("County"), filed two proofs of claim in this matter. The first, filed on February 4, 1998, represents an unsecured priority claim of $450.00 for child support payments owed pursuant to a divorce decree ("County child support claim"), and ascribed priority status under 11 U.S.C. § 507(a)(7). Attached thereto is a copy of the divorce judgment between Dale and his former wife, Lana Fay Alvstad, entered on July 14, 1993 in the District Court for Mountrail County, which details the extent of Dale's support obligations to his children.

The second, filed on January 14, 1998, represents an unsecured priority claim in the amount of $550.00, stemming from fines Dale purportedly owes pursuant to a criminal judgment ("County criminal judgment claim"). The Clerk of the District Court failed to specifically identify the priority status of the claim.[4] Moreover, the proof of claim as filed does not contain any attached documentation which would inform the Court of the specific basis—either factual or statutory—for the claimed amount.

Lastly, Curt Truhson ("Truhson") filed a proof of claim on May 11, 1998 for an unsecured priority claim in the amount of $488.00 for "seed." Truhson indicated that the claimed amount includes charges in addition to the principal amount of the claim. However, he failed to attach an itemized statement of these additional charges, although

---

**3.** Dale's reply brief states that he "has made arrangements for advance payment on the cash rent of his farm ground [sic] which is presently under the [CRP]. Therefore, he will have available advance payment for the 1999 rent in 1998 for the payments due in December of this year." However, Dale provides no information as to the source or substance of these "arrangements." (Are they contractual or informal? Has the purported lessee any financing or insurance for this transaction? Etc.) The Court cannot entertain argument in this form where not even the slightest support has been provided therefor—support,

which, the Court adds, it is the obligation of the *debtor* to provide. In the law of bankruptcy, it is axiomatic, and this Court need hardly explain, that when a debtor presents a plan for confirmation, it is he who must prove up confirmation, lest the confirmation of his plan be denied.

**4.** As specification of the priority of the claim, the Clerk of the District Court noted only "Criminal Judgment." This notation, does not, per se, indicate or establish priority status.

the standard form contains instructions to do so, and additionally failed to attach any documentation verifying the basis for his claim. Further, Truhson failed to specify the priority of his claim, noting only "seed" in this connection.

### 3. Plan Treatment of Claims

· On April 17, 1998, Dale filed a Chapter 12 Plan of Reorganization, to which the United States filed an objection on May 15, 1998. A confirmation hearing was held on May 20, 1998, and was continued until June 22, 1998. On June 8, 1998, Dale filed his Amended Plan, by which he attempted to redress the objections of the United States.

In this respect, the Amended Plan treats the claims of FSA and RHS as follows: (1) all claim payments are to be made directly to each of these creditors beginning on December 15, 1998; (2) FSA is to receive annual payments of $12,747.12 on its allowed claim of $180,314.66, as amortized over 40 years at 6.5 percent interest; and, separately, is to receive annual payments of $2,943.00 on its allowed claim of $16,000.00, as amortized over 7 years at 6.75 percent interest, said interest to begin accruing upon the date of plan confirmation; and (3) RHS is to receive annual payments of $1,164.40 on its allowed claim of $15,984.34, as amortized over 40 years at 6.75 percent interest. However, the Amended Plan does not allow for any payments to the IRS on its claim arising from Dale's failure to file his 1989, 1990, 1991, and 1996 tax returns, in the event that a nondischargeable income tax debt results once he files the delinquent returns.[5]

The Amended Plan also provides treatment for the claims of the County and Truhson. Dale lists the County child support claim as an unsecured priority claim, a characterization which comports with the County's filing of its claim. However, Dale's treatment of all other claims previously listed differs, in either their characterization or amount, or both, from the creditors' statements of their claims. In this respect, Dale contends the County criminal judgment claim is an unsecured nonpriority claim, rather than an unsecured priority claim. Finally, he characterizes Truhson's claim as being an unsecured nonpriority claim in the amount of $1,087.65, rather than an unsecured priority claim of $488.00.[6]

Under the Amended Plan, Dale characterizes each of these claims as "U Class Claims," that is, impaired unsecured claims, which he treats as follows:

> [T]he debtor does not own any property which is not exempt or fully secured to the

**5.** In this respect, Dale's Amended Plan provides as follows:

> The Internal Revenue Service has filed a proof of claim stating that it holds ... total claims of $151,198.25.... [S]uch tax claim[s] arose out of an assessment based on debt forgiveness granted to the debtor by Farmers Home Administration. The debtor has been informed, on an informal basis that such assessment will be removed upon the filing of the appropriate tax returns by the debtor showing that such debt forgiveness did not result in the debtor becoming solvent. It being the understanding of the debtor that if the debt forgiveness granted by Farmers Home Administration does not make the tax payer [sic] solvent, [sic] that it is not considered as taxable income. The debtor proposes that the plan shall be confirmed and the debtor shall file such tax returns and resolve such tax assessments within 12 months of the date of confirmation herein. Should the debtor fail to resolve such tax issues within this time frame then the debtor will so inform the [C]ourt and the Internal Revenue Service and the [C]ourt can, at that time, consider the dismissal of the debtor's case....

As to the claims described above, the debtor has not yet filed his returns for 1989, 1990, and 1991. Such returns shall be filed within 12 months of the date of confirmation. Also, the debtor has not filed his tax return for 1996. Such tax returns shall be filed within 30 days of confirmation. If the debtor should fail to file [these tax returns] as provided above, the debtor's Chapter 12 case herein shall be dismissed upon the filing of an affidavit signed by a representative of the Internal Revenue Service stating that one or more of such returns have not been filed as provided for herein. However, upon the proper filing of such returns, the debtor's Chapter 12 case shall proceed forward and any taxes owing as set forth in such returns shall be payable during the term of the plan in equal installments over the life of the plan with a first payment due January 1, 1999.

**6.** The question of the priority status of these claims figures prominently in the Court's analysis of Dale's ability to confirm his Amended Plan, which will be later discussed.

secured creditors as described in this plan. For such reason, under a Chapter 7 liquidation bankruptcy, all such unsecured creditors would receive a dividend of zero. [sic]

The debtor anticipates having available funds in at least the amount of $100.00 per month which can be used to pay administrative claims and unsecured creditors. Therefore, after the approved fees of the trustee and the debtor's attorney have been paid as described ... in this plan, the debtor shall continue to pay to the trustee the sum of $100.00 per month during each remaining month during the term of the plan to be disbursed by the trustee to those creditors who have filed proofs of claim which have been approved for payment by the trustee.

After payment of trustee's fees, whatever they may be, the debtor anticipates paying an additional $2000.00 in attorney's fees, if approved by the Court, before making payment on unsecured claims. As the term of Dale's Amended Plan is three years, he effectively proposes to pay very little, or nothing, on all of the "U Class Claims," including those not discussed above.

### 4. Dale's Income and Expense Projections under the Amended Plan

Although Dale has limited the term of his Amended Plan to three years, attachments thereto include income and expense projections for the years 1998 through 2002. This information, coupled with, and occasionally corrected by, that provided under his Amended Plan, states in pertinent part as follows:

INCOME

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Cash Rent of Farm Real Property | $18,000.00 | $18,180.00 | $18,362.00 |
| Cash Rent of CRP–Enrolled Property | -0- | 3,800.00 | 3,800.00 |
| CRP Payments | 4,616.00 | -0- | -0- |
| Income from Off–Farm Employment | 12,000.00 | 12,060.00 | 12,120.00 |
| TOTAL GROSS INCOME [7] | 34,616.00 | 34,040.00 | 34,282.00 |

EXPENSES

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Real Estate Taxes | $2,300.00 | $2,325.00 | $2,350.00 |
| Federal Income Taxes [8] | 3,800.00 | 3,825.00 | 3,850.00 |
| State Income Taxes | 530.00 | 535.00 | 540.00 |
| Insurance | 1,600.00 | 1,645.00 | 1,675.00 |
| Utilities and Telephone | 2,100.00 | 2,100.00 | 2,100.00 |
| Family Living | 7,050.00 | 7,121.00 | 7,192.00 |
| TOTAL EXPENSES | 17,380.00 | 17,551.00 | 17,707.00 |

PLAN PAYMENTS

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| FSA (Land) | $12,747.12 | $12,747.12 | $12,747.12 |

7. As the United States correctly points out in its brief, Dale's Cash Flow Analysis erroneously tallies these income figures to be $36,614.00 in 1998; $36,039.00 in 1999; and $36,282.00 in 2000. The Court has substituted the correct figures for those just mentioned.

8. At the June 22 hearing, Dale produced an exhibit asserting that his 1998 federal income taxes would amount to $1,691.00, based upon taxable income of $12,000. Although it appears the exhibit was prepared by Dale's attorney, neither Dale nor his attorney has signed it. No documentation was submitted with the exhibit in support of its veracity or of the assertions contained

therein. The exhibit conflicts with Dale's federal income tax projections in 1998, 1999, and 2000, as submitted with his signed Amended Plan as detailed above.

The Court declines to substitute the figure listed in the exhibit received June 22, which purports to represent Dale's projected 1998 federal income tax liability, for those contained within the cash flow analysis attached to his Amended Plan. It appears that the bases for the two projections are identical in each instance; none of the figures in the cash flow analysis appear to have been altered in the exhibit. Furthermore, and significantly, Dale has offered no explanation, or testimonial or documentary support, for his new-

| | | | |
|---|---|---|---|
| FSA (Chattel) [9] | 2,943.00 | 2,943.00 | 2,943.00 |
| RHS (Land) | 1,164.40 | 1,164.40 | 1,164.40 |
| Trustee & Attorney Fees & Unsecured Claims | 1,200.00 | 1,200.00 | 1,200.00 |
| TOTAL PLAN PAYMENTS | $18,054.52 | $18,054.52 | $18,054.52 |

### 5. Objection to Confirmation by the United States

On June 18, 1998, the United States objected to the Amended Plan upon numerous bases. In its objection, and in its subsequent, well-executed brief, the United States argues principally against the feasibility of Dale's Amended Plan, upon the following grounds: (1) Dale's income and expense projections propose a negative cash flow; (2) RHS is entitled to setoff the proceeds of Dale's forthcoming CRP payment; (3) the United States is entitled to an assignment of all rents derived from Dale's real property, pursuant to the terms of its mortgages thereon; (4) Dale's Amended Plan fails to provide for the nondischargeable income tax debt arising from his failure to file his 1989, 1990, 1991, and 1996 federal income tax returns; (5) the Amended Plan fails to provide proper payment for his delinquency in 1996 and 1997 North Dakota real estate taxes; (6) his income projections are conjectural; and (7) his expense projections are unrealistic. The United States additionally contends that Dale should not be permitted to extend reamortization of its secured claims from a term of 30 years, as contained within the loan documents, to one of 40 years.

## II. DISCUSSION OF LAW

The Court will first address several issues which adversely affect Dale's income projections, before reaching the overarching issue of his ability to confirm his Amended Plan. The first issue is one raised by the United States in opposition to confirmation, to wit, RHS's claim to a right of setoff of the proceeds of Dale's anticipated Fall 1998 CRP payment. The second concerns Dale's failure to provide payment under the Amended Plan for various claims which cannot be ignored.

### 1. Setoff

#### i. Dale's Estoppel Argument

Initially, the Court pauses to dismiss Dale's unsupported contention that the United States is estopped from asserting its claimed right of setoff. At the June 22 hearing, negligible testimony was elicited, and no evidence was proffered, on the subject of Dale's estoppel argument. Indeed, it has been the subject of only the briefest of comment by the debtor. In sum, there is insufficient evidence before the Court to permit its consideration of this line of argument. Accordingly, the Court proceeds to its discussion of the United States' claim to a right of setoff.

#### ii.

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)); *see also Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 370, 10 L.Ed. 759 (1841) (Setoff is the "common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him."). Although the Bankruptcy Code does not create a federal right of setoff, Section 553(a) preserves, with certain exceptions, any right of setoff which otherwise exists. *Strumpf*, 516 U.S. at 18, 116 S.Ct. at 289; *accord*

---

ly produced, and fortuitously timed, 1998 federal income tax projection.

In any event, as will be later discussed, even were the Court to find differently on this point, and to accept Dale's more recent 1998 federal income tax projection as accurate, it would not alter the outcome of these proceedings.

9. As correctly noted by the United States, while Schedule 3 to the Amended Plan provides for annual FSA chattel payments of $2,886.16, the text of the Amended Plan itself provides for annual payments of $2,943.00.

741

*United States v. Gerth,* 991 F.2d 1428, 1430 (8th Cir.1993).

■■■ Section 553(a) provides in relevant part that:

Except as otherwise provided in this section . . ., this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtors is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B) (i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a). In order to establish a right of setoff under this section, the creditor must establish the following three elements:

1. A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.

2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.

3. The debt and the claim are mutual obligations.

*Gerth,* 991 F.2d at 1431; *see Kalenze v. Federal Crop Ins. Corp. (In re Kalenze),* 175 B.R. 35, 37 (Bankr.D.N.D.1994). Otherwise put, "it is necessary only that the debt and the claim both arose prepetition and are mutual." 991 F.2d at 1431.

■■■ All three of the statutory elements necessary to setoff are satisfied in the instant matter. As the United States contends, Dale's indebtedness to RHS, which totaled more than $45,000.00 at its inception, arose prepetition; Dale is entitled to receive a payment of $4,616.00 in Fall 1998 from CCC, said payment having arisen prepetition; [10] and the debt and claim are mutual obligations. Thus, it would appear that FSA is entitled to a right of setoff of the debtor's forthcoming CRP payments.

Nevertheless, some case law on this subject would instruct otherwise. While most courts which have exercised discretion to limit or deny setoff have done so in response to the presence of illegal or fraudulent conduct, or a breach of fiduciary duty, *see, e.g., Blanton v. Prudential–Bache Sec., Inc. (In re Blanton),* 105 B.R. 321, 337–38 (Bankr. E.D.Va.1989) (and cases cited therein); others, too, hold the same where setoff would hinder or destroy a debtor's ability to reorganize, *see, e.g., In re Allen,* 135 B.R. 856, 870 (Bankr.N.D.Iowa) (and cases cited therein).

However, this Court must depart from the those latter decisions, on the basis that the

---

**10.** "Dependency on a postpetition event . . . does not prevent a debt from arising prepetition." *Photo Mechanical Servs., Inc. v. E.I. Dupont De Nemours & Co., Inc. (In re Photo Mechanical Servs., Inc.),* 179 B.R. 604, 615 (Bankr.D.Minn. 1995). "A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events." *Gerth,* 991 F.2d at 1434; *accord Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.),* 893 F.2d 720, 724 (5th Cir.1990). For purposes of setoff, "a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contin-

gent, unliquidated, or unmatured when the petition was filed." *Gerth,* 991 F.2d at 1433. The crucial factor, then, is simply "whether the genesis of each debt was prepetition, that is, whether the events giving rise to the debt occurred before bankruptcy." I David G. Epstein et al., *Bankruptcy* § 6–40, at 671 (1992) (citing *Braniff Airways, Inc. v. Exxon Co. U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987)). Here, Dale's claim—his right to payment under the contracts—came into existence when his contracts were signed and he was promised payments under the CRP. *See Gerth,* 991 F.2d at 1434.

statutory language under which the right of setoff is preserved, unhampered, does not admit to such an exception. This judicially-created shelter, which has arisen exclusively for reorganizing debtors, is not found within Section 553. Indeed, the only exceptions to the rule that a creditor's right to setoff shall be unaffected by bankruptcy appear within the section itself. And of the enumerated exceptions therein, no provision has been made immunizing reorganizing debtors from any otherwise valid rights of setoff which have been asserted against them. Rather, Congress has clearly and expressly provided in Section 553 that the Bankruptcy Code *"does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...."* 11 U.S.C. § 553(a) (emphasis added). Thus, the right to setoff under the statute exists equally in cases of liquidation and cases of reorganization. *SeeTurner v. Small Bus. Admin. (In re Turner)*, 84 F.3d 1294, 1299 (10th Cir.1996) ("Section 553, which clearly preserves existing setoff rights in the context of bankruptcy, applies to both liquidations as well as reorganizations.... This statutory provision simply is inconsistent with the notion that the Bankruptcy Code prohibits an administrative offset in a reorganization case."). Accordingly, there is no justification for dissimilar application of the statute between the two.

Moreover, it is not without significance that the statute preserves in eligible creditors a *right of setoff.* The term "right" connotes entitlement. Once a creditor in a reorganization case has established the necessary preconditions for entitlement to a right of setoff, his right should ordinarily be enforced. Equitable considerations in no way absolve a court from enforcing this right, once it has been established, in cases where such enforcement jeopardizes a debtor's prospects for reorganization. The Court joins the Tenth Circuit Court of Appeals in rejecting the notion "that to allow administrative setoffs in a reorganization is inconsistent with the rehabilitative purpose of the Bankruptcy Code." *In re Turner*, 84 F.3d at 1299.

Lastly, the Court addresses the pronouncement by the Court of Appeals for the Eighth Circuit that, "a bankruptcy court may disallow an otherwise proper § 553 setoff if there are compelling reasons for not allowing such a preference." *Bird v. Carl's Grocery Co. (In re NWFX, Inc.)*, 864 F.2d 593, 595 (8th Cir.1989). The *Bird* Court did not elaborate on the import of its statement. While it is conceivable that the passage refers to the statutory exceptions to the right of setoff, as contained within Section 553, or perhaps to instances where illegal or fraudulent conduct are present, it would not seem to apply to the instant matter. This is so, for the judicially-created exception—that is, sheltering reorganizing debtors from otherwise valid rights of setoff—has been effected by bankruptcy courts relying upon Section 105 for such authority.[11] Yet, in *Bird*, the Eighth Circuit discusses at length the inherent limitations of the equitable powers of the bankruptcy court under Section 105, as follows:

> Generally, the bankruptcy court possesses only the jurisdiction and powers conferred upon it by Congress, and its broad equitable powers may only be used to further the policies and provisions of the Code.

> The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Unquestionably, § 105 is comparable to the All Writs Statute, 28 U.S.C. § 1651. Its purpose is to allow the bankruptcy court to issue equitable orders such as injunctions and stays and to punish for

---

**11.** Section 105 provides in pertinent part that:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

contempt in cases where such actions are consistent with the provisions of the Code. Section 105 does not empower a bankruptcy court to create new substantive rights. *Id.* (citations omitted). This discussion reinforces this Court's previous analysis of the United States' claim of a right of setoff for RHS. Accordingly, and for all of the reasons just described, the Court will allow RHS its right of setoff against the debtor's anticipated payments under the CRP.

## 2. Additional Claims Which Must Be Paid under the Amended Plan

The Court's analytic framework hereunder is two-pronged. First, the Court sketches the requirements of Section 1222, which mandates the payment of certain claims under a plan of reorganization. Section 1222 then serves to frame the Court's principal inquiries, that is, whether such claims exist in the debtor's case, and whether they have been ignored by him under the Amended Plan.

### *Section 1222*

■ Section 1222 sets forth the necessary contents of a Chapter 12. In pertinent part, the plan must provide, inter alia, "for the full payment, in deferred cash payments, of all claims entitled to priority under section 507...." 11 U.S.C. § 1222(a)(2). *See Brown v. Internal Revenue Serv. (In re Brown)*, 82 F.3d 801, 806 (8th Cir.1996); *Greseth v. Federal Land Bank (In re Greseth)*, 78 B.R. 936, 941 (D.Minn.1987); *In re Rott*, 94 B.R. 163, 168 (Bankr.D.N.D.1988 ). Payments on unsecured claims can only be deferred, at most, over the life of the plan. *See* 11 U.S.C. § 1222(c),[12] 8 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 1222.05, at 1222–10 (15th ed. rev.1998).

### *ii. Proofs of Claim*

■ Pursuant to Rule 3002(a) of the Federal Rules of Bankruptcy Procedure, Chapter 12 creditors must file proofs of claim in order to participate in any distribution in a case. *See* Fed.R.Bankr.P. 3002(a); 9 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 3001.02, at 3001–6 (15th ed.rev.1998). Several principles which govern the effect of filing a proof of claim apply, under the instant facts, to the case at hand.

■ First, once a proof of claim is filed, the claim is deemed allowed unless a party is interest objects. 11 U.S.C. § 502(a),[13] *Federal Deposit Ins. Corp. v. Union Entities (In re Be–Mac Transp. Co.)*, 83 F.3d 1020, 1025 (8th Cir.1996); *Gran v. Internal Revenue Serv. (In re Gran)*, 964 F.2d 822, 827 (8th Cir.1992).

■ Second, "[a] proof of claim which comports with the requirements of Bankruptcy Rule 3001(f) constitutes prima facie evidence of the validity and amount of the claim." *Brown v. Internal Revenue Serv. (In re Brown)*, 82 F.3d 801, 805 (8th Cir. 1996) (internal quotation marks omitted) (quoting *In re Hemingway Transp. Inc.*, 993 F.2d 915, 925 (1st Cir.)), *cert. denied*, 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993); *see In re Be–Mac Transp. Co.*, 83 F.3d at 1025; *In re Gran*, 964 F.2d at 827; *In re Roberts*, 210 B.R. 325, 327 (Bankr. N.D.Iowa 1997); *Laptops Etc. Corp. v. District of Columbia (In re Laptops Etc. Corp.)*, 164 B.R. 506, 522 (Bankr.D.Md.1993) (Judge William A. Hill sitting by special designation); *see also Gardner v. New Jersey*, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947) ( "A proof of claim is ... prima facie evidence of its validity ...." ) ; *Vomhof v. United States*, 207 B.R. 191, 192 (D.Minn.1997).

In this respect, Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Accordingly, the claims filed in the instant matter must com-

---

**12.** Section 1222(c) provides, in pertinent part, that:

> [T]he plan may not provide for payments over a period that is longer than three years unless the court for cause approves a longer period, but the court may not approve a period that is longer than five years.

11 U.S.C. § 1222(c).

**13.** Section 502(a) provides in full that:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

11 U.S.C. § 502(a).

port with the requirements of the Rules, and, under the instant facts, particularly with the requirements of Rule 3001(c) and (d), in order "to be entitled to the weight afforded by Rule 3001(f)." 9 King, *Collier on Bankruptcy* ¶ 3001.09[1], at 3001–26. Rule 3001(c) provides as follows:

> (c) *Claim Based on a Writing.* When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

Fed.R.Bankr.P. 3001(c).[14] In turn, Rule 3001(d) provides:

> (d) *Evidence of Perfection of Security Interest.* If a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected.

Fed.R.Bankr.P. 3001(d).

■ Third, and joining these two principles, "[a]n objection will deprive a proof of claim of its validity only if the objection is supported by substantial evidence." *Vomhof,* 207 B.R. at 192; *see In re Brown,* 82 F.3d at 805; *In re Hemingway Transp., Inc.,* 993 F.2d at 925.

■ However, an exception to one subpart of the second rule exists in the following: the documentary requirement of Rule 3001(c) does not extend to claims which are based upon statutory, as opposed to written, obligations. *See State Bd. of Equalization v. Los Angeles Int'l Airport Hotel Assocs. (In re Los Angeles Int'l Airport Hotel Assocs.),* 106 F.3d 1479, 1480 (9th Cir.1997); (per curiam); *United States v. Braunstein (In re Pan),* 209 B.R. 152, 156, (D.Mass.1997);

*Vines v. Internal Revenue Serv. (In re Vines),* 200 B.R. 940, 949 (M.D.Fla.1996).

■ Moreover, missing documentation, where required by Rule 3001(c), is not ordinarily fatal to the establishment of a claim. As the Court of Appeals for the Seventh Circuit instructed in *In re Stoecker,* 5 F.3d 1022 (7th Cir.1993):

> If the documentation is missing, the creditor cannot rest on the proof of claim. It does not follow that he is forever barred from establishing the claim. Nothing in the principles or practicalities of bankruptcy or in the language of any rule or statute justifies so disproportionate a sanction for a harmless error. Forfeitures of valuable claims, and other heavy sanctions, should be reserved for consequential or easily concealed wrongs. *Prussner v. United States,* 896 F.2d 218, 224 (7th Cir.1990) (en banc); *Lorenzen v. Employees Retirement Plan,* 896 F.2d 228, 232 (7th Cir.1990). A creditor should therefore be allowed to amend his incomplete proof of claim ... to comply with the requirement of Rule 3001, provided that other creditors are not harmed by the belated completion of the filing. *In re Unioil,* 962 F.2d 988, 991–93 (10th Cir.1992); *In re Unroe,* 937 F.2d 346 (7th Cir.1991); *Wilkens v. Simon Bros., Inc.,* 731 F.2d 462, 464–65 (7th Cir.1984) (per curiam); *In re South Atl[.] Fin[.] Corp.,* 767 F.2d 814, 819 (11th Cir.1985).

*Id.* at 1027.

### iii. IRS' Claim for Nondischargeable Income Tax Liabilities and County Child Support Claim

The proof of claim filed by the IRS, in the amount of $500.00 for its unsecured priority

---

**14.** The bankruptcy court in *In re Immerfall,* 216 B.R. 269 (Bankr.D.Minn.1998), provides the following, apt discussion of the import and consequences of this subsection:

> This rule imposes the procedural burden of producing documentary proof of secured status on any creditor that asserts such, when it proves up its claim pursuant to 11 U.S.C. § 501(a) and Fed.R.Bankr.P. 3001. *In re Catron,* 198 B.R. 905, 907 (Bankr.M.D.N.C.1996). *See also In re Papercraft Corp.,* 187 B.R. 486, 500 (Bankr.W.D.Pa.1995) (under Rule 3001(c), proof of claim must include supporting documentation if its exists); *In re Lindell Drop*

> *Forge Co.,* 111 B.R. 137, 142 (Bankr. W.D.Mich.1990) (if supporting writing is lost or destroyed, creditor must include explanation [of] circumstances). Compliance with this rule enables the proof of claim to achieve the status provided in Fed.R.Bankr.P. 3001(f). *In re Los Angeles Intern. Airport Hotel Associates,* 196 B.R. at 139. Generally speaking, a creditor should have an opportunity to remedy a "harmless error" in failing to provide the documentation required by Rule 3001(c). *In re Stoecker,* 5 F.3d 1022, 1028 (7th Cir.1993).

*Id.* at 272 (footnote omitted).

claim and $150,698.25 for its unsecured general claims, comports with the requirements of Rule 3001(f), and thus constitutes prima facie evidence of its validity and amounts. In this respect, the claim does not fall within the compass of the documentation requirement of Rule 3001(c), as its basis lies in statute. Moreover, the debtor has not filed an objection to the claim, and thus, does not challenge its validity.

▮ The debtor has failed to specifically enunciate the terms of, and provide for, payment of the priority portion of the IRS claim under his Amended Plan, as he is required to do pursuant to Section 1222(a)(2). This sum must be included within his cash flow analysis and paid within the term of the Amended Plan, thereby potentially increasing payments thereunder.[15]

The County child support claim in the amount of $450.00 similarly meets the requirements of Rule 3001(f), and thus constitutes prima facie evidence of its validity and amount. In this respect, the appropriate documentation has been submitted with the claim to allow its compliance with Rule 3001(c). Moreover, the debtor has not filed an objection to the claim, and thus, does not challenge its validity.

▮ Once again, Dale has failed to specifically enunciate the terms of, and provide for, payment of this priority claim under his Amended Plan, as required by Section 1222(a)(2). This sum must also be included within his cash flow analysis and paid within the term of the Amended Plan, thereby potentially increasing payments thereunder.

### iv. County Criminal Judgment and Truhson Claims

▮ The County criminal judgment claim is not entitled to the weight afforded by Rule 3001(f). First, the Court is unable to ascertain from the face of the document, or any attachments thereto, whether it is a claim based in statute, and thus freed from compliance with the documentation requirement of Rule 3001(c). Second, if the claim falls within the compass of Rule 3001(c), the County has not attached the necessary documentation to satisfy the rule.

Similarly, Truhson's proof of claim in the amount of $488.00 fails to comply with the requirements of Rule 3001(c), and thus fails to meet the requirements of Rule 3001(f). Truhson fails, inter alia, to specify the priority of his claim, noting only, in that connection, that it stems from "seed."

### 3. Feasibility

▮ It is the debtor's burden to establish all of the elements essential to the confirmation of a plan, including its feasibility. See Ames v. Sundance State Bank (In re Ames), 973 F.2d 849, 851 (10th Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993); In re Harper, 157 B.R. 858, 865 (Bankr.E.D.Ark.1993); cf. Euerle Farms, Inc. v. State Bank (In re Euerle Farms, Inc.), 861 F.2d 1089, 1091–92 (8th Cir.1988) (burden of debtor to establish feasibility of plan); In re Kuether, 158 B.R. 151, 153 (Bankr.D.N.D.1993) (same). Under Chapter 12, the feasibility requirement pertains to all proposed plans pursuant to Code § 1225(a)(6), which mandates plan confirmation if "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6); see Abele v. Webb (In re Webb), 932 F.2d 155, 157 n. 3 (2d Cir.1991); In re Kuether, 158 B.R. at 153.

▮ In determining whether a debtor is capable of meeting the feasibility requirement, the Court must scrutinize the term of his plan, and whether, in light of his projected income and expenses, the debtor is likely to meet his obligations thereunder. See Prudential Ins. Co. v. Monnier (In re Monnier), 755 F.2d 1336, 1341 (8th Cir.1985); In re Honeyman, 201 B.R. 533, 537 (Bankr.D.N.D. 1996); In re Foertsch, 167 B.R. 555, 565

---

**15.** The Court pauses to remark upon the IRS' unsecured general claim. The debt stems from the debtor's failure to file his required federal income tax returns in the years 1989, 1990, and 1991. As such, it appears that the liability is nondischargeable pursuant to Section 523(a)(1)(B)(i), which provides that "[a] discharge under section ... 1228 ... does not discharge an individual debtor from any debt for a tax ... with respect to which a return, if required[,] was not filed[.]" 11 U.S.C. § 523(a)(1)(B)(i). Although the claim is peripheral in the context of these confirmation proceedings, and is effectively ignored by the debtor under his Amended Plan, it will have considerable detrimental, if not devastating, effect upon the debtor's financial situation outside of bankruptcy.

(Bankr.D.N.D.1994); *see also Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985); *In re Harper*, 157 B.R. at 866. While it is not required that the debtor guarantee his plan, "[he] must provide 'reasonable assurance that the plan can be effectuated.'" *In re Ames*, 973 F.2d at 851 *(quoting First Nat'l Bank v. Hopwood (In re Hopwood)*, 124 B.R. 82, 86 (E.D.Mo.1991)).

 In this sense, the debtor must demonstrate that his proposed plan is "both realistic and will cash flow." *In re Kuether*, 158 B.R. at 153; *see In re Dittmer*, 82 B.R. 1019, 1022 (Bankr.D.N.D.1988). His assurances towards this end must be "based upon realistic and objective facts (as opposed to visionary or overly optimistic projections)." *In re Honeyman*, 201 B.R. at 537; *see also In re Ames*, 973 F.2d at 851 (quoting *In re Novak*, 102 B.R. 22, 24 (Bankr.E.D.N.Y. 1989)) ("A plan's 'income projections must be based on concrete evidence and must not be speculative or conjectural.'"); *In re Clarkson*, 767 F.2d at 420 ("the feasibility test is firmly rooted in predictions based on objective fact."). Thus, although it is this Court's established practice to grant all debtors *every reasonable benefit of the doubt* in matters concerning plan feasibility in furtherance of the rehabilitative policies underlying the Code, *see, e.g. In re Foertsch*, 167 B.R. at 566; *In re Konzak*, 78 B.R. 990, 994 (Bankr. D.N.D.1987), the Court will not blindly confirm a plan which will not cash flow, and which is, therefore, unfeasibly, *see In re Dittmer*, 82 B.R. at 1022.

#### 4. Cash Flow Analysis

As will next be demonstrated, Dale's Amended Plan, as proposed, does not cash flow. This failure is complete under Dale's own cash flow projections; but is even more pronounced when those projections are adjusted for further considerations.

First, even granting Dale the considerable, and improbable, benefit of the doubt that he will in fact derive rental income and off-farm income in the amounts he has projected, and, further, be capable of living within the means of his meager projected living expenses, still, his income and expense projections under his Amended Plan propose negative cash flows in each of 1998, 1999, and 2000. In 1998, Dale projects gross income of $34,616.00; expenses of $17,380.00; and plan payments of $18,054.52. Under these figures, Dale will experience a negative cash flow of $818.52 in 1998.

In 1999, Dale projects gross income of $34,040.00; expenses of $17,551.00; and plan payments of $18,054.52. Accordingly, Dale will encounter a negative cash flow of $1,565.52 in 1999.

In 2000, Dale projects gross income of $34,282.00; expenses of $17,707.00; and plan payments of $18,054.52. These figures indicate Dale will suffer a negative cash flow of $1,479.52 in 2000.

However, Dale's projections fail to account for RHS's right of setoff of his anticipated $4,616.00 CRP payment in 1998. Adjusting his total income projection for 1998 accordingly, Dale's negative cash flow situation will increase from $818.52, as described above, to $5,434.52.[16]

Assuming that trustee's and attorney's fees will aggregate at least $2,651.00 in this case, then, when both the priority claims of the IRS and the County are taken into consideration, claims aggregating $950.00, Dale's negative cash flow increases once again.[17] Were the trustee's and attorney's fees to aggregate at least $3,600.00 over the term of the plan, and were Dale to attempt to pay the IRS and County claims in the first year of his Amended Plan, he would suffer a resultant negative cash flow of $6,384.52 in 1998. Alternatively, were he to defer payment of these claims, paying them in equal

---

**16.** Thus, as previously mentioned, even were the Court find Dale's 1998 federal income tax projection to be $1,691.00, as opposed to $3,800.00 as stated in his cash flow analysis, he would still experience an insurmountable negative cash flow in that year of the plan.

**17.** Under the Amended Plan, Dale provides $100.00 per month over three years—or $3,600.00—in payment towards the following claims in descending priority: the trustee's fees, attorney's fees, and unsecured claims. Trustee's fees are unspecified under the plan; remaining attorney's fees amount to $2,000.00; and the unsecured priority claims of the IRS and the County total $950.00. Accordingly, if the trustee's fees amount to any sum in excess of $650.00, Dale's negative cash flow situation will increase.

installments over the term of his plan, he would experience negative cash flows of $5,751.18 in 1998, $1,882.18 in 1999; and $1,796.18 in 2000. Furthermore, were the Court to allow the County and Truhson to amend their incomplete proofs of claim, and were they able to do so in such a way as to meet compliance with the various requirements of Rule 3001, then these claims would further increase Dale's negative cash flow under the term of his Amended Plan.

█ In sum, these analyses lead the Court to conclude that Dale's income is insufficient to meet his expenses and plan payments, and that his Amended Plan, as proposed, is therefore unfeasible and unconfirmable. All other objections by the parties are accordingly rendered moot on this point.

### III. Conclusion

Based upon the foregoing analysis, the confirmation of the First Amended Plan of the debtor, Dale G. Alvstad, is DENIED.

**SO ORDERED.**