**In re James A. NOVAK and Parpatina M. Novak, Debtors.**

**No. 00–30423.**

United States Bankruptcy Court,
D. North Dakota.

Aug. 31, 2000.

---

29. *Id.* at 434.

30. *Id.*

Wayne Drewes, Fargo, ND, Trustee of Bankruptcy Estate.

Moody Farhart, Minot, ND, Attorney for Debtors.

Lowell Bottrell, Fargo, ND, Attorney for RDO Financial Services & Ag Capital Co.

Allen Flaten, Grand Forks, ND, Attorney for AgriBank, FCB.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the Court is to consider confirmation of the Debtors' Third Modified Chapter 12 Plan filed August 28, 2000. The only unresolved objections are those raised by RDO Financial Services ("RDO") and Ag Capital Company ("Ag Capital"), both of whom have previously been granted relief from stay but who now, as unsecured creditors, not only challenge confirmation but also, by separate motion, seek dismissal of the case. The

Motion for Dismissal came on for hearing in conjunction with the confirmation hearing held on August 28, 2000, and will be addressed in the context of this order.

The Debtors filed a Chapter 12 petition on March 22, 2000, and on April 27, 2000, before a plan had been formulated, were faced with a motion for relief from stay by which RDO and Ag Capital sought recovery of combines used by the Debtors in a custom combining business. At the relief from stay hearing considerable information was presented by RDO and Ag Capital in establishing a lack of reorganizational prospects and the Court in its resulting order granting them relief from stay, focused upon the Debtors' operational history concluding that in the absence of contrary evidence, that there was very little to suggest a reasonable prospect for reorganization.

Following that hearing and the loss of the combines, the Debtors hired a financial advisor and filed three successive plans. With each they hoped to meet the various creditors' objections. With their Third Modified Plan they have succeeded to address all objections except those raised by RDO and Ag Capital. These creditors continue to challenge the plan on the issue of feasibility and also object on the basis that the Debtors have failed to meet the requirements of section 1225(a)(4) in that their liquidation analysis fails to factor into the equation the value of the current year's crops and the value of an interest in an unsecured 100 acre tract of real property.

### 1.

For over forty years the Debtor, James Novak, now 68 years old, and his wife have farmed in the Minot area. They hope to retain their farm for the foreseeable future. They own approximately 1,035 acres plus a one-half interest in another 120 acres and lease an additional 796 acres for a total crop acreage of 1,360 acres. In past years they have operated a diversified grain operation and until losing their combines, also conducted a custom combining business. According to the June 9, 2000 summary of operations for the current crop season they have 1,100 acres seeded to wheat, 287 acres in flax, and 480 acres in barley. These planting figures are not the same as testified to at the confirmation hearing. Inexplicably, James Novak testified that 973 acres are seeded to wheat, 207 acres to flax, 175 acres to barley, and 75 acres to canola. All are on a one-third/two-thirds crop share with his son. Although testimony was given on the anticipated market and yield for each of these crops, James was very comfortable with projecting a $90.00 per acre overall yield for this year's crops, not including government payments. Accepting his income estimate as reasonable would mean this year's crop is worth $128,700.00 (1,430 acres × $90.00) and the Debtors' share would be worth $85,800.00. The plan as proposed calculates crop income to be $122,400.00 based upon 1,360 acres at $90.00 per acre. This calculation, however, fails to recognize that the Debtors only have a two-thirds crop share interest, at least according to James Novak's testimony. The canola is swathed and will be harvest ready in another ten days. The other crops are also nearing harvest stage. On a per-acre average, the Debtors anticipate a very successful year. Coupled with social security, rent income, and government program payments, their total gross income for the year 2000 is anticipated to be $168,886.00. Operating expenses for the year have been significantly reduced from past years but according to their agricultural consultant, and their son, who is a soils and seed specialist with N.D.S.U., the reduced operating expenses are consistent with the changed nature of the farming enterprise. Further changes are being made in future years when the Debtors will cease to farm the land and will instead rent it out to their son. This will further reduce operating expenses by approximately 48% across the board. Total operating expenses are figured at $97,400.00 for the current year which would leave

$71,476.00 available to meet plan payments for the current year. Future years envision the Debtors maintaining a farming operation on leased acreage only. In these years total income from all sources including social security, leasing, and government payments is projected at $155,596.00 and expenses are anticipated to be $93,472.00 inclusive of both operating and living expenses. This would leave $62,124.00 available for plan payments.

2.

### The Plan and Claim Treatment

The Debtors' three-year plan addresses the claims of their principal secured creditors. AgriBank has a claim of $97,781.00 which requires a payment of $17,243.00 to be made by September 20 of this year. FSA, with a secured claim of $335,351.00, will receive a payment of $29,948.00 in the first year and each succeeding year. New Holland Credit with a security interest in a tractor is to be paid $4,000.00 per year over four years. Future taxes are anticipated at $4,000.00 per year and administrative costs are projected at $10,000.00 for the first year and $4,000.00 in subsequent years. In addition, back taxes of $4,255.00 are to be paid in the first year of the plan. Thus, for the first year the Debtors will need to satisfy $69,312.00 in fixed payments to secured creditors and $56,207.00 for these creditors in succeeding years. If their income and expense projections are reasonably accurate, these objectives can be met but with absolutely no margin for error. RDO and Ag Capital, however, both filed applications for administrative expense treatment stemming from the Debtors' use of the combines post-petition. The Debtors have made no provision for this claim charging that any use of the equipment was paid for through previous adequate protection payments.

Attached to the plan is the Debtors' liquidation analysis which takes into account all of their real property, harvested crops and chattels. For the most part, after deducting their existing liens and allowing for available exemptions, there is nothing of value left except for an unencumbered one-half interest in 100 acres of farmland worth $20,000.00. RDO and Ag Capital charge that the liquidation analysis fails to include this year's crops which very shortly are to be harvested. Accepting the Debtors' overall anticipated per-acre income figure of $90.00 per acre would mean that the Debtors' share of this year's crop is worth at least $85,800.00, assuming a two-thirds interest. It is even greater if one uses the plan estimate. This expected yield is not a part of the liquidation analysis and the plan provides the unsecured creditors will receive only a pro-rata share of the projected disposable income. Accepting the Debtors' income and expense estimates as plausible results in disposable income for the first year of $18,164.00 and $5,917.00 for each of the succeeding plan years. The plan identifies unsecured and undersecured creditors as being those set forth in the schedules. These are nine in number and consist mainly of credit card issuers with the total scheduled unsecured debt being placed at $52,568.00. RDO and Ag Capital additionally point out that their deficiency claim arising after liquidation of the recovered combines is not acknowledged in the schedules and may possibly be as much as $250,000.00.

3.

### The Best Interest of Creditors Test

The prerequisites for confirmation of a Chapter 12 plan are seven in number, each separately set out in section 1225 of the Bankruptcy Code. Among them is section 1225(a)(4) popularly called the "best interest of creditors test." As relevant, this provision provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

.     .     .     .     .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such

claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . .

Under this provision, a plan may not be confirmed unless it is shown that the holders of unsecured claims will receive more under the plan, on a present-value basis, than they would have received in a Chapter 7 liquidation. 8 *Collier on Bankruptcy* ¶ 1225.02[4], at 1225–8 (Lawrence P. King ed., 5th ed. rev.2000). This requires performing a hypothetical liquidation analysis taking into account the value of the property available to creditors as of the effective date of the plan and then comparing that value to what each creditor will be receiving under the plan as proposed. The plan may be confirmed only if the present value of the proposed payments at least equal the likely distribution from the hypothetical liquidation.

■ There has been some discussion in the courts over what the point in time should be for making this value comparison. Confusion was created by the Eighth Circuit case of *Hollytex Carpet Mills v. Tedford*, 691 F.2d 392 (8th Cir.1982) which was understood by some courts as requiring the comparison to be made as of the date of case commencement. *E.g. In re Nielsen*, 86 B.R. 177 (Bankr.E.D.Mo.1988). Currently most courts, after considering the issue, have concluded, based upon a clear reading of the statute and common sense, that the comparison is to be made as of the effective date of the plan, not the date of petition filing. *In re Hopwood*, 124 B.R. 82 (E.D.Mo.1991); *In re Bremer*, 104 B.R. 999 (Bankr.W.D.Mo.1989); *In re Musil*, 99 B.R. 448 (Bankr.D.Kan.1988). This Court agrees with the prevailing authority believing no other interpretation of section 1225(a)(4) is logical given the plain language of the statute. The Debtors' plan states that the effective date is ten days following the order of confirmation. Thus, under the better reasoned cases, the value comparison must be determined no earlier than the date of the confirmation hearing and no later than the date set out in the plan itself. The cases of *In re Lupfer Bros.*, 120 B.R. 1002 (Bankr.W.D.Mo.1990); *In re Bremer, supra*, and *In re Borg*, 88 B.R. 288 (Bankr.Mont.1988), each involved situations where the value of crops for the current growing season were omitted from the debtor's liquidation analysis thus bringing into question section 1225(a)(4). In each of these cases the court concluded that the value of the current year's crops must be included in the liquidation calculation because they were in existence as of the effective date of the plan. Similarly, in the case at bar, the liquidation analysis provided by the Debtors must include the Debtors' share of the current year's crop worth at least $85,800.00. It must also include the $20,000.00 value of the unencumbered 100 acre tract. Were the Debtors' estate liquidated today or at anytime close to the date of the confirmation hearing held on August 28, the approximate value of property available for distribution to the unsecureds would be $105,800.00.

■ Responding to the section 1225(a)(4) argument, the Debtors point to section 1225(b)(1)(B) with their argument apparently being that by committing all disposable income to the plan they overcome any section 1225(a)(4) objection. Section 1225(b)(1)(B) is not an alternative to the best interest of creditors test. Rather, it is a separate test intended to set forth a minimum standard of repayment to unsecured creditors. *See generally In re Willingham*, 83 B.R. 552, 553 (Bankr. S.D.Ill.1988). The disposable income as projected is relevant to the extent that it is a projection of the amount available for distribution over the plan years, and thus, can be used in making the comparison between plan distributions and the hypothetical liquidation distribution. In the instant case, the plan projects $18,164.00 being available to unsecureds in the first plan year and $5,917.00 being distributed to them in each of the succeeding two years of the plan. Under the most optimistic of scenarios and without making any reduction for present value, the unsecured

creditors would receive a distribution of $29,998.00 over the three-year plan against an immediate hypothetical liquidation distribution of as much as $105,800.00. From this comparison, it is plain that section 1225(a)(4) has not been satisfied and the Third Modified Plan cannot be confirmed on this basis alone.

### 4.

### *Feasibility*

Given the need to overcome the liquidation value available for distribution by making an equivalent plan distribution, feasibility becomes highly doubtful.

The feasibility requirement is set forth in section 1225(a)(6). This provision requires that for confirmation to occur, it must be shown that "the debtor will be able to make all payments under the plan and to comply with the plan." As this Court has stated in many previous opinions, while this requirement is not a guarantee of performance, it does require reasonable assurance that the plan terms can be carried out. *In re Sauer,* 223 B.R. 715 (Bankr.D.N.D.1998); *In re Alvstad,* 223 B.R. 733 (Bankr.D.N.D.1998); *In re Honeyman,* 201 B.R. 533 (Bankr.D.N.D.1996); *In re Oster,* 152 B.R. 960 (Bankr.D.N.D. 1993). Even if one accepts the Debtors' currently projected income and expenses as being within the realm of possibility, it is abundantly apparent that the plan becomes impossible to cash flow once a best interest of creditors requirement is factored in. In this case that requirement means that either the Debtors sell the current year's crops as well as unencumbered land and distribute the proceeds to the unsecured creditors or, they retain this property and make a distribution to the unsecured creditors over the term of the plan in an amount at least equal to the value of this property. Either situation creates an impossible financial hurdle for them.

While this Court is prepared to give debtors the benefit of the doubt in farm reorganizations recognizing their desire to retain the farm, it cannot blindly confirm a plan that simply will not cash flow. In this case the Debtors' Third Modified Plan will not cash flow given the strictures of section 1225(a)(4). The situation becomes even worse if RDO and Ag Capital are later found to have administrative expense claims that must be reckoned with. Moreover, as this Court originally observed in its Order granting these two creditors relief from stay, it is hard to envision any plan that would be capable of achieving confirmation.

### 5.

### *Conclusion*

For the foregoing reasons, confirmation of the Debtors' Third Modified Plan is **DENIED**. The motion of RDO Financial Services and Ag Capital Company for dismissal of the Debtors' pending chapter 12 case is **GRANTED** pursuant to section 1208(c)(9).

**SO ORDERED.**