755 F.2d 1336
 12 Collier Bankr.Cas.2d 323, Bankr. L. Rep. P 70,286
In re MONNIER BROTHERS, a Partnership, Alan Dale Monnier and
Janice Irene Monnier; Thomas Richard Monnier and
Bonnie LaVonne Monnier, Debtors.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellee,
v.
Alan Dale MONNIER, Janice Irene Monnier, Thomas Richard
Monnier and Bonnie LaVonne Monnier, Appellants.
In re MONNIER BROTHERS, a Partnership, Alan Dale Monnier and
Janice Irene Monnier; Thomas Richard Monnier and
Bonnie LaVonne Monnier, Debtors.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,
v.
Alan Dale MONNIER, Janice Irene Monnier, Thomas Richard
Monnier and Bonnie LaVonne Monnier, Appellees.
 Nos. 84-1478, 84-1518.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 10, 1984.
Decided March 1, 1985.
 
 Claier R. Gerry, Sioux Falls, S.D., for appellant.
 Robert E. Hayes, Sioux Falls, S.D., for appellee.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 These appeals are from a decision of the District Court for the District of South Dakota[1] modifying and affirming the bankruptcy court's confirmation of a chapter 11 reorganization plan. Debtors (Monnier Brothers, a partnership consisting of Alan Dale Monnier and Thomas Richard Monnier; and Alan Dale Monnier and Thomas Richard Monnier and their wives, as individuals) appeal from the district court's decision to increase the rate at which interest on debtors' secured indebtedness to Prudential Insurance Company would accrue during operation of the plan. Prudential contends in a cross appeal that the plan ought not to have been confirmed, urging that (1) the plan does not give "adequate protection" to Prudential's secured interest; (2) the plan is not feasible; and (3) the plan is unfair and inequitable, and discriminates against Prudential. For reasons to be stated, we affirm.
 
 
 2
 Debtors are farmers. Prudential loaned debtors $800,000 on May 16, 1981. The loan was evidenced by a note, and secured by a mortgage upon farmland debtors own in Deuel County, South Dakota. By the terms of the note and mortgage, interest on the Prudential loan would accrue at a rate of thirteen percent per annum, and at a rate of fifteen percent per annum on overdue installments. The term of the loan was fifteen years, although Prudential could shorten this term after giving notice to the borrowers. The first installment of principal was due on June 1, 1983. Debtors failed to make this principal payment, having filed their original chapter 11 petitions in the United States Bankruptcy Court for the District of South Dakota on January 3, 1983.
 
 
 3
 Prudential then requested the bankruptcy court to modify the automatic stay of 11 U.S.C. Sec. 362, so that Prudential might begin state foreclosure proceedings. After a hearing, the bankruptcy court denied Prudential's request for modification of the stay. The bankruptcy court determined that the fair market value of the Deuel County property was $1,356,000; that as of March 1, 1983, debtors' total indebtedness to Prudential, including accrued interest, had been $1,012,209.63; that continued use of the property by debtors was essential to successful reorganization; and that the "equity cushion of approximately $300,000.00" would provide adequate protection for Prudential during the preconfirmation period.
 
 
 4
 Subsequently, the bankruptcy court confirmed the plan over Prudential's objections. (Ten other classes of creditors, most of them holding fully secured claims, had accepted the plan.) The confirmed plan described how and when each claim would be repaid, and made predictions as to 1983 crop yields, crop prices, and expenses. The plan provided for an initial payment by debtors of $75,000 toward accrued interest then owing on the Prudential debt. The plan also called for the remaining indebtedness to Prudential to be repaid in level amortized installments over a fifteen year period. Under the confirmed plan, interest was to accrue on the Prudential claim for periods prior to the confirmation date at the default rate set by the note and mortgage, and thereafter at a 10.5 percent rate (the December, 1983 United States treasury bill annual investment yield discount factor). Because the plan did not provide for immediate payment in cash of Prudential's claim, and because Prudential opposed the plan, the district court, at debtors' request, invoked the "cram down" provisions of chapter 11 to confirm the plan. 11 U.S.C. Sec. 1129(b).
 
 
 5
 Prudential then sought review in the district court. The district court affirmed confirmation of the plan, but reversed the bankruptcy court's order of confirmation "insofar as the order fixes the interest rate that is paid The Prudential Insurance Company of America to be 10.5% rather than the 13% rate set out in the mortgage." The present appeals followed.
 
 1. Interest Rate
 
 6
 Debtors contend (and the bankruptcy court agreed) that under chapter 11 "cram down" provisions, the bankruptcy court could take evidence regarding various prevailing interest rates, and could then make applicable to the scheduled deferred payments due Prudential under the plan whatever rate of interest would insure that Prudential eventually would receive the value of the amount that had been owed on the date the plan was confirmed. U.S.C. Sec. 1129(b)(2)(A)(i)(II).[2] Prudential, however, suggests that when a creditor is oversecured, and prevailing interest rates at confirmation time are lower than the rate set by the loan agreement between the debtor and the creditor, a reorganization plan calling for deferred repayment of the secured debt under 11 U.S.C. Sec. 1129(b)(2)(A)(i)(II) must always provide for accrual of interest at the contract rate, so as to adequately compensate for impairment to the creditor's foreclosure rights, and otherwise give the creditor the full benefit of his bargain.
 
 
 7
 Under Sec. 1129(b)(2)(A)(i)(II), deferred cash payments due Prudential must total "a value, as of the effective date of the plan, of at least the value of [Prudential's] interest in the estate's interest in" the collateral. Since the Prudential loan was accelerated and oversecured, Prudential had a right at the date the plan became effective to the unpaid principal plus any contract rate interest that had accrued up until that time. The task of the bankruptcy court was to determine what rate of interest would insure Prudential ultimately receive the full value of that amount, given that the plan provided for level amortized payments over a fifteen year period.
 
 
 8
 One of the Code's few clues about what factors to take into account in selecting an appropriate interest rate appears in Sec. 1129(b)(2)(A)(iii); that section states that a plan may be confirmed over the objections of a secured creditor if the plan affords the creditor the "indubitable equivalent" of his claim. 11 U.S.C. Sec. 1129(b)(2)(A)(iii). Legislative history indicates Congress intended for this phrase to take on the meaning given it by Judge Learned Hand in In re Murel Holding Co., 75 F.2d 941, 942 (2d Cir.1935). See In re American Mariner Industries, 734 F.2d 426, 433 (9th Cir.1984). As the Ninth Circuit has noted, Murel emphasized two factors in determining whether a reorganization plan provided a secured creditor adequate protection for the full value of his claim:
 
 
 9
 Judge Hand concluded that the creditor's right to "get his money or at least the property" may be denied under a plan for reorganization only if the debtor provides a "substitute of the most indubitable equivalence." Such a substitute clearly must both compensate for present value and insure the safety of the principal.
 
 
 10
 In re American Mariner Industries, 734 F.2d at 433 (emphasis added). Although Sec. 1129(b)(2)(A)(iii), with its "indubitable equivalent" standard, is stated as an alternative to deferred repayment of the secured debt under Sec. 1129(b)(2)(A)(i)(II), we are satisfied from a reading of Murel that the congressional reference to the case expresses threshold requirements applicable to selection of an appropriate interest rate. Cf. In re American Mariner Industries, 734 F.2d at 432 ("indubitable equivalent" provision of 11 U.S.C. Sec. 361 is a "catch-all alternative").
 
 
 11
 In the present case, neither Prudential nor debtors provided the bankruptcy court with much assistance in determining what interest rate would compensate Prudential for the time value of its money and the risks to its principal. Prudential provided no evidence on the issue, other than the rate set by the contract. Debtors, relying on 5 Collier on Bankruptcy p 1129.03, at 1129-63 n. 45, provided the bankruptcy court with the prime rate, federal fund rate, discount rate, call money rate, commercial paper rate, certificates of deposit rate, and treasury bill rate, that had been reported in the December 9, 1983 Wall Street Journal. The debtors ignored, however, a subsequent passage from the Collier discussion:
 
 
 12
 The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.
 
 
 13
 5 Collier on Bankruptcy p 1129, at 1129-65. We note that the treasury bill rate, which the bankruptcy court ultimately applied, reflected one rate of return available on a short term, low risk investment. See In re Loveridge Machine & Tool Co., 36 B.R. 159 (Bankr.D.Utah 1983).
 
 
 14
 According to the "market value" appraisal of the Deuel County property, Prudential was, at the time the plan became effective, oversecured, both with respect to principal and with respect to interest that had accrued under the contract. In these circumstances, we cannot say the district court erred in requiring interest to be paid under the plan at the contract rate. Only some twenty months had elapsed between the time the contract was made and the time the plan was confirmed; the contract, like the plan, contemplated a fifteen year payment term; and identical security was involved, since under the plan, Prudential retains a lien on the Deuel County property. In other words, the contract rate, which was a rate agreed upon in an arms' length bargain between businessmen, presumably reflected the prevailing cost of money (at least as of May, 1981), the prospects for appreciation or depreciation of the value of the security, and the risks inherent in a long-term agricultural loan. Lacking any evidence correlating other rates with the "coerced loan" contemplated by the plan, the district court did not err in reinstating the contract rate of interest. Cf. In re Southern States Motor Inns, Inc., 709 F.2d 647, 651-53 (11th Cir.1983) (error, in selecting interest rate applicable to deferred repayment under chapter 11 of tax claim, to ignore variations between the length of the payment period, quality of security, and the risk of subsequent default), cert. denied, --- U.S. ----, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); In re Loveridge Machine & Tool Co., 36 B.R. 159 (Bankr.D.Utah 1983) (in chapter 11 cram down, interest rate should consist of risk-free rate, plus additional interest to compensate creditor for risks posed by the plan).[3]
 
 2. Adequate Protection
 
 15
 Prudential argues that its interests were not adequately protected during the preconfirmation period, and will not be adequately protected during operation of the plan. In support of this argument, Prudential contends that the bankruptcy court erred in using the market value, rather than the liquidation value, of the Deuel County property in assessing the extent of the "equity cushion" available to protect Prudential. Prudential further argues that an equity cushion is not, in itself, sufficient protection for a secured creditor's interest; and that in any event the equity cushion in this case is too small to assure protection of Prudential over the life of the plan.
 
 
 16
 We note that "adequate protection" is not a standard the Bankruptcy Code uses in connection with confirmation decisions. Instead, the adequate protection requirements apply primarily in the context of preconfirmation proceedings. See, e.g., 11 U.S.C. Sec. 362(d). Insofar as Prudential now contends the plan is too risky, such concerns must be addressed in terms of the cram down standards of 11 U.S.C. Sec. 1129(b), or the feasibility requirement of 11 U.S.C. Sec. 1129(a)(11). In addition, the adequate protection challenge Prudential makes to the propriety of the bankruptcy court's stay rulings may well be moot. The bankruptcy court's December 29, 1983 order of confirmation appears to have discharged the obligation for which Prudential sought adequate protection, and to have terminated the automatic stay. See 11 U.S.C. Secs. 362, 1141. See also In re American Mariner Industries, 734 F.2d 426, 429 (9th Cir.1984) ("Congress intended the courts to conclusively and expeditiously adjudicate, apart from the bankruptcy proceedings as a whole, complaints for relief from the automatic stay"). Cf. In re Leimer, 724 F.2d 744 (8th Cir.1984) (bankruptcy court's order denying relief from the automatic stay is a final order for purposes of appeal).
 
 
 17
 Even though the issue may be moot, the parties have not so treated it and we have considered Prudential's arguments that it was not adequately protected during pendency of the stay. We find these arguments to be without merit. We need not decide whether in all cases a significant equity cushion would be enough to adequately protect a secured creditor, in part because, prior to the final order of confirmation, debtors have paid (or offered to pay) Prudential $75,000 toward unpaid interest. Also, it appears that with the equity cushion described by the bankruptcy court, the value of the Deuel County property as of the confirmation date would have been more than enough to satisfy debtors' indebtedness to Prudential, including all contract-rate interest that had accrued up until that date. Prudential does not allege that the value of the Deuel County property was depreciating rapidly during the stay (indeed, the only evidence on this point was that land values in the area had remained fairly level); nor does Prudential allege that its contract rate of interest was insufficient to compensate it for the use of its money. Cf. In re American Mariner Industries, 734 F.2d 426, 432 (9th Cir.1984) (Code requires adequate protection when creditor's interest is shown to have value and value is "necessarily threatened"). Finally, in this regard we note that the land appraisal figure accepted by the bankruptcy court for purposes of gauging the extent of the equity cushion was a figure offered by Prudential's witness, and was not the highest figure presented to the court. Use of the market value was not inappropriate--legislative history indicates that in an adequate protection dispute, "determination of which entity should be entitled to the difference between the going concern value and the liquidation value" should be decided according to the equities of the particular case. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 338, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6295-96. Cf. In re American Mariner Industries, 734 F.2d 426, 435 n. 12 (9th Cir.1984) ("to avoid overcompensating the secured creditor the timing of adequate protection payments should take into account the usual time and expense involved in repossession and sale of the collateral").[4]
 
 3. Feasibility
 
 18
 Section 1129(a)(11) provides that the court shall confirm a plan only if "[c]onfirmation ... is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor ... unless such further ... reorganization is proposed in the plan." 11 U.S.C. Sec. 1129(a)(11). Prudential argues that debtors' plan does not meet the Sec. 1129(a)(11) feasibility requirement. Specifically, Prudential alleges that debtors' projected earnings and yields are overly optimistic; that the plan fails to take into account income taxes which will become due upon sale of crops; and that the district court's upward adjustment of the interest rate on the deferred repayment of the Prudential loan made the plan unworkable. Prudential also argues that debtors' disclosure statement showed projected expenses and plan payments for 1983 would exceed 1983 earnings by $100,000.
 
 
 19
 Construing feasibility requirements in the context of a plan of arrangement proposed under the Bankruptcy Act, this court stated: "[i]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55, 64 (8th Cir.1967). Success need not be guaranteed. 5 Collier on Bankruptcy p 1129.02, at 1129-33. Cf. In re Anderson, 28 B.R. 628, 630-631 (S.D.Ohio 1982) (bankruptcy court did not err in finding chapter 13 plan feasible, even though success of debtors' plan was far from certain, where court gave objecting creditor the opportunity to force modification of the plan if creditor's interest became imperiled).
 
 
 20
 The bankruptcy court found that debtors' plan was feasible; and the district court, after considering briefs and hearing oral argument on the feasibility issue, affirmed the finding. We have carefully reviewed the record, and cannot say that the feasibility finding, as affirmed by the district court, was clearly erroneous. Projecting future income of, and expenses of, an extensive farming operation such as debtors' cannot be an exact science. The bankruptcy court heard evidence about the accuracy of debtors' crop yield and earnings projections, and reasonably resolved the conflicts in that evidence in debtors' favor. The plan states that "all taxes of any kind whatsoever will be paid at or before the same become due;" Prudential did not inquire into this matter during the many hearings on the plan, nor did Prudential present evidence of its own about the effect taxes might have. Similarly, aside from conclusory statements, Prudential has not attempted to show that the district court's adjustment of the interest rate on the Prudential claim made the plan unworkable. Prudential's predictions of a $100,000 shortfall in 1983 fail to take into account $225,000 from 1982 crop sales which the disclosure statement indicated would be applied toward 1983 expenses. It is true that during the first years the plan is in effect, the amount of such carry-over earnings will likely decrease, year by year; however, several debts will be discharged under the plan after five years, and payments due creditors under the plan will then decrease. It appears debtors operated within the bounds of their projections in 1983.
 
 
 21
 Prudential also complains that the bankruptcy court erroneously permitted debtors to present testimony which varied from the representations contained in the disclosure statement. This argument has no merit. The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan. 11 U.S.C. Sec. 1125. The Code's disclosure requirements, according to the legislative history, are intended to be flexible:
 
 
 22
 Precisely what constitutes adequate information in any particular instance will develop on a case by case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the costs of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection .... In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.
 
 
 23
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 409, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6365. Prudential chose to reject the plan, and does not now indicate any dissatisfaction with that choice. The particular testimony in question fleshed out the details of a sideline cattle operation proposed in the plan, and showed how the results of debtors' farming efforts in 1983 compared with the projections contained in the disclosure statement. The new evidence suggested that the prospects for successful reorganization were somewhat greater than the disclosure statement might indicate. The reorganization proceedings were protracted, and during those proceedings one creditor consented to debtors having free use of $104,000's worth of grain to feed cattle. In these circumstances, we cannot say the bankruptcy court erred in admitting and considering this additional testimony.
 
 4. Sec. 1129(b)(1)
 
 24
 Section 1129(b)(1) provides that before claims of a dissenting class of secured creditors may be "crammed down" by confirmation of a reorganization plan, the court must determine that the plan "does not discriminate unfairly, and is fair and equitable." 11 U.S.C. Sec. 1129(b)(1). As Prudential notes, the "fair and equitable standard" includes, but is not limited to, the requirement under Sec. 1129(b)(2) that the creditor receive the full value of his claim. Indeed, "fair and equitable" is a term of art, and means, among other things, that the plan must assure each creditor's claim is given appropriate priority. See In re King Resources Co., 651 F.2d 1326, 1340 (10th Cir.1980). Prudential argues, essentially, that the fact that it is forced to wait longer than other creditors under the plan to receive full compensation for its claim makes the plan unfair, inequitable, and discriminatory.
 
 
 25
 We are not persuaded by this argument. When the proposed treatment of Prudential's claim is contrasted with treatment of other secured claims, no inequity or discrimination is apparent. The cram down provisions contemplate deferred repayment of secured loans. Prudential, like all other secured creditors under the plan, will receive repayment in level amortized payments over a fixed term of years. Prudential retains its lien; its original loan to debtors had a fifteen year term; and its collateral is not subject to rapid depreciation, unlike the machinery securing certain other debts the plan encompasses. When the proposed treatment of Prudential's claim is compared with treatment of unsecured claims, again no inequity or discrimination is apparent. The unsecured creditors will receive no interest, even though repayment of principal will be in level amortized payments over a ten year term; and the unsecured creditors retain no liens to protect them in the event of a default.
 
 
 26
 As indicated, the judgment of the district court is affirmed.
 
 
 27
 HEANEY, Circuit Judge, concurring and dissenting.
 
 
 28
 I concur in the majority opinion with one exception, that being the interest rate allowed on the Prudential loan. In my view, the appropriate interest rate was a question of fact to be determined by the bankruptcy court, see In Re George Buggiere Chrysler-Plymouth, 727 F.2d 1017, 1019 (11th Cir.1984), and we cannot set that decision aside unless it was clearly erroneous. In Re Greenbrook Carpet Co., 722 F.2d 659, 660-61 (11th Cir.1984). In my view, Prudential's efforts to show that it was erroneous were clearly inadequate. Indeed, the bankruptcy court rather convincingly demonstrated that any interest rate higher than 10.5% would make it difficult for the reorganization to succeed.
 
 
 
 [1]
 The Honorable John B. Jones, United States District Judge, District of South Dakota
 
 
 [2]
 As pertinent to today's decision, 11 U.S.C. Sec. 1129(b) provides that a bankruptcy court shall, at the request of the debtor, confirm a chapter 11 plan over the objections of a class of secured creditors if
 (b)(1) ... the plan does not discriminate unfairly, and is fair and equitable, with respect to such [dissenting] class....
 (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
 (A) With respect to a class of secured claims, the plan provides--
 (i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
 (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or
 (iii) for the realization by such holders of the indubitable equivalent of such claims.
 We note that under the plan, Prudential's claim is assigned a class of its own.
 
 
 [3]
 On brief, debtors contend that the district court erred in substituting its own findings on this issue for those of the bankruptcy court. We do not agree. Even if selection of an appropriate interest rate is in part a factual inquiry, the record in this case presented only one rate which would necessarily have had some correlation with the "cost" to Prudential of the deferred payment plan. See In re Southern States Motor Inns, Inc., 709 F.2d 647, 653 n. 11 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984)
 
 
 [4]
 We note that in treating as fully secured Prudential's claim for preconfirmation contract-rate interest, the bankruptcy court gave Prudential the benefit of the difference between fair market and liquidation values. See 11 U.S.C. Sec. 506(b)