**In re DANNY THOMAS PROPERTIES III LIMITED PARTNERSHIP, An Arkansas Limited Partnership a/k/a Le Marquis Apartments (Phase II), Debtor.**

**Bankruptcy No. 96–42482M.**

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

March 18, 1999.

Gregory M. Hopkins, Little Rock, AR, for debtors.

Joyce Bradley Babin, Little Rock, AR, for Beal Bank.

Charles Tucker, U.S. trustee.

## ORDER

JAMES G. MIXON, Chief Judge.

On June 28, 1996, Danny Thomas Properties III Limited Partnership ("Debtor III") filed a voluntary petition for relief under the provisions of chapter 11 of the United States Bankruptcy Code. Debtor III filed a proposed plan of reorganization, and after a confirmation hearing [1] on May 20–21, 1998, in Little Rock, Arkansas, the case was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the Court has jurisdiction to enter a final judgment in the case.

Debtor III, an Arkansas limited partnership, owns and operates an apartment complex in North Little Rock, Arkansas, known as Le Marquis Apartments Phase II. The apartments are operated in conjunction with other contiguous apartments owned by a different limited partnership, Danny Thomas Properties II Limited Partnership, known

---

1. The Court also considered a motion to dismiss or convert at the hearing.

also as Le Marquis Apartments Phase I. Although the two properties are operated as a single unit, the legal ownership and the debt structure are different and, therefore, the two entities must be discussed separately as to confirmation of each separate proposed plan. For clarity, the Debtor will be referred to as Debtor III and the apartment complex as Phase II in this Opinion.

## BACKGROUND

According to Debtor III's disclosure statement, the limited partnership was formed in 1983, and in early 1984 it acquired Phase II. The record does not reflect the original purchase price of the property.

On January 6, 1984, William Daniel Thomas Jr., General Partner of Debtor III, executed a promissory note payable to Twin City Bank in the principal sum of $1,741,500.00. The note is payable in monthly installments of $15,641.01 beginning March 1, 1984, and interest accrues on the unpaid principal at the rate of 10.5% per annum. The last payment on the note is due on February 1, 2019.

A first Deed of Trust lien on Phase II secures the note, which is a non-recourse obligation. A security interest in all personal property used in connection with Phase II also secures the obligation. The note was assigned to the Secretary of Housing and Urban Development and ultimately acquired by Beal Bank. The proof of claim filed by Beal Bank and not disputed by Debtor III is for the sum of $2,221,438.30 as of May 19, 1998.[2]

The plan as modified by a pleading filed May 18, 1998 contains seven classes of creditors. Class One consists of the secured claim of Beal Bank; Class Two provides for the secured claim of Metro Builders; Class Three consists of the unsecured creditors' claims in the amount of $500.00 or less; Class Four includes general unsecured claims; Class Five includes the claims of Danny Thomas Management Company; Class Six provides for the claims of interest of the limited partners; and Class Seven contains the claim of interest of the General Partner, William Daniel Thomas Jr.

Class One, Beal Bank, and Class Four, the general unsecured creditors not otherwise classified, voted to reject the plan. No votes were cast in Class Three, consisting of unsecured creditors with claims of $500.00 or less, or in Class Six, consisting of claims of interest of the limited partners. Class Two, Metro Builders; Class Five, the unsecured claim of Danny Thomas Management Company; and Class Seven, the claim of interest of the general partners, voted to accept the plan. The plan treats all classes of claims and interest as impaired and proposes to pay all claims in full plus interest.

Beal Bank objects to confirmation of the modified plan on numerous grounds and argues that (1) the plan does not pay the present value of its secured claim and (2) the plan is not feasible and, therefore, fails to comply with 11 U.S.C. § 1129(a)(11).

## DISCUSSION

### I.

### THE PRESENT VALUE OF THE SECURED CLAIM OF BEAL BANK

The plan proposes that the fully secured claim of Beal Bank shall be paid as follows:

1. Commencing 30 days after the effective date, Debtor III shall pay twenty-four monthly payments of interest to Beal Bank.

2. Thereafter, Debtor III will pay monthly payments of principal and interest amortized on a 30–year basis with a final balloon payment on the tenth anniversary of the effective date of the plan.

The plan proposes that Beal Bank retain its lien and provides that if Debtor III fails to make any payment due under the plan for forty-five days after receipt of written notice of default and opportunity to cure given by Beal Bank, Debtor III shall be in default. Debtor III's plan as modified May 18, 1998,

2. Debtor III treats Beal Bank as fully secured. Beal Bank's proof of claim listed the sum of $2,231,438.31, a figure that is inconsistent with Beal Bank's itemization attached to the proof of claim. Debtor III's Summary of Ballots Received values the claim at $2,221,438.30 which is assumed to be correct for purposes of this opinion.

provides that in the event of an act of default as described above, "Beal Beal (sic)[Bank] may immediately initiate foreclosure and Debtor III will consent to the entry of a foreclosure decree." (Debtor's Modification to First Amended Plan of Arrangement and Reorganization at 2.)

 A claim is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. 11 U.S.C. § 506(a) 1994; 4 Collier on Bankruptcy ¶ 506–02 (Lawrence P. King et al. eds, 15th ed. rev.1998). When a class of secured creditors votes to reject a plan, the plan may still be confirmed under the cramdown provision in chapter 11. This subsection provides that a plan may be confirmed over the objection of a secured creditor if:

> each holder of a claim of such class receive[s] on account of such [secured] claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of such plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i)(II) (1994).

 In order for a future stream of payments to equal the allowed amount of the secured claim, interest at an appropriate discount rate must be added to the principal payment. This Court has previously analyzed the various methods of determining the appropriate discount rate and has adopted a method approved by the Eighth Circuit Court of Appeals. *See, In re E.I. Parks No. 1 Ltd. Partnership,* 122 B.R. 549, 555 (Bankr. W.D.Ark.1990) (relying on *U.S. v. Doud,* 869 F.2d 1144 (8th Cir.1989)). This method contemplates a market rate of interest determined by selecting a risk-free rate based on government securities and adding points based on risk factors. *In re E.I. Parks,* 122 B.R. at 555. Both Debtor III and Beal Bank have proposed this method.

 Beal Bank's calculation begins with the interest rate of a 30–year treasury obligation and adds 2.5 to three points as a risk factor to arrive at a discount rate of 8.5% to 9%.[3] Debtor III's calculation begins with the interest rate of a 10–year treasury obligation and adds two points as a risk factor to arrive at a discount rate of 7.64%. Both sides presented expert testimony as to the appropriateness of the respective rate. In arriving at the appropriate market rate of interest, elements to be considered include "the term of the payout period, the quality of the security and the risk of subsequent default." *In re E.I. Parks,* 122 B.R. at 555 (citing *Prudential Ins. Co. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1339 (8th Cir.1985)).

Michael Pyron, testifying for Debtor III, explained that he selected the 10–year treasury rate because it matched the maturity date in the plan. He observed some "positive risk elements," namely, the fact that the property's North Little Rock location boasts a well developed, stable, and strong economic base. (Tr. at 320.) The property is located in an area where real property is appreciating, although, according to Pyron, the appreciation is "not great." (Tr. at 320.) He also observed that the local economy supports this type of development.

The negative risk factors Pyron observed were that a considerable degree of property maintenance has been deferred; that a number of units were out of service for various reasons; and that there has been a recent excessive turnover in tenant occupancy. However, Debtor III points out that the plan requires Debtor III to contribute $250,000.00 over five years to be applied to deferred maintenance, which will be a positive contribution to the value of the property.

Debtor III also emphasizes that the plan provides that in the event of default, the plan requires Debtor III to cure or consent to an immediate foreclosure. This factor lessens the risk to Beal and should be considered in arriving at the. proper discount rate.

Testifying on behalf of Beal Bank, Bill Puddephatt calculated the market rate of interest to be 8 ½% to 9% per annum. He stated that using a 9% discount rate and a

---

**3.** The discount rate for 10–year treasury obligations was established to be 5.65% and 30–year treasury rates were established to be 5.93%.

25–year amortization would result in an annual debt service of $224,714.00, while using an 8 ½% discount rate on a 25–year amortization would result in a yearly total of $215,618.00. He selected the 25–year amortization because twenty-five years is the anticipated length of the economic life of the property, according to an appraisal report he was furnished.

The witness stated that he based his calculations on a 30–year Treasury obligation rate instead of the 10–year rate used by Pyron because "that's closer to the amortization schedule being requested by the debtor-in-possession." (Tr. at 248.) Reliance on the 30–year rate is warranted, he concluded, because there is "no identified take out source" [4] available at the end of the 10–year plan. (Tr. at 248.)

Puddephatt assigned a 2 ½% to 3% risk factor instead of 2% based on several factors, including the 1997 actual income and expenses and the condition of the property, which he described as "Class C property." (Tr. at 249.) He also observed that because the obligation to Beal Bank was non recourse "more reliance has to be placed on the performance of the property . . . ." (Tr. at 250.)

Puddephatt explained on cross-examination that risk factors are based on annual debt service coverage ratio, loan to value ratio, and age and condition of the property. The higher the property's grade, the better the credit risk and the lower the margin above the stated index, in this case, the selected treasury note rate. If a loan carries a higher calculated risk factor, then that loan will carry a greater margin markup over the index to compensate for the risk. The witness further testified that the risk factor would decrease for a loan term of ten years as opposed to twenty-five. Nevertheless, he added that because there is no known take-out lender at present, Beal "may well be in that loan beyond the ten years if they are unable to move it," a fact that justifies a higher risk factor. (Tr. at 262.)

■ Choosing between a 7.64% rate and an 8.5%–9% discount rate is difficult. Each expert offered plausible reasons for the rate they supported. However, the Court finds that the base rate is more appropriately calculated on the rate of a ten-year treasury obligation because that is the plan length. Debtor III must replace Beal Bank with another source of financing on or before ten years from the effective date, or the plan will be in default and Beal will be entitled to an immediate and uncontested right of foreclosure.

■ The question of whether to assign a 2% or 2.5%–3% risk factor is also difficult to determine accurately. At best, choosing the appropriate risk factor is a guess because the risk depends on future events that are unpredictable in nature. The Court will accept Debtor III's estimate of the risk factor at 2% based on the reasons advanced by its expert, Pyron, and also because the 2% risk factor helps facilitate the reorganization of Debtor III. The plan provision permitting Beal an immediate uncontested foreclosure of its liens in the event of default at any time during its ten-year life is an important factor in the selection of the 2% risk factor. *See, e.g., In re 203 N. LaSalle Street Partnership*, 126 F.3d 955, 959 (7th Cir.1997) (approving a plan providing that in case of debtor's default, deed held in escrow would be conveyed to secured creditor), *cert. granted sub nom. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street Partnership*, —— U.S. ——, 118 S.Ct. 1674, 140 L.Ed.2d 812 (1998); *Financial Security Assurance Inc. v. T–H New Orleans Ltd. Partnership (In re T–H New Orleans Ltd. Partnership)*, 116 F.3d 790, 802 (5th Cir.1997) (affirming the bankruptcy court's finding of feasibility where debtor's plan proposed *dation en paiement* as reasonable alternative that would result in full payment of secured creditor's claim).

### FEASIBILITY OF THE PLAN

■ The Bankruptcy Code provides that a plan cannot be confirmed unless "confirmation is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor . . . ." 11 U.S.C. § 1129(a)(11) (1994). To be feasible, a chapter 11 plan must offer a reasonable prospect

4. "Take-out source" refers to a new source of financing.

of success and be workable, although success need not be guaranteed. *Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1341 (8th Cir.1985) (citing *United Properties, Inc. v. Emporium Dep't Stores, Inc.,* 379 F.2d 55, 64 (8th Cir.1967) and 5 Collier on Bankruptcy ¶ 1129.02 at 1129–33); *In re Alvstad* 223 B.R. 733, 745 (Bankr.D.N.D.1998) (applying the rule to a chapter 12 plan) (citing *In re Ames,* 973 F.2d 849, 851 (10th Cir.1992)).

▌ Section 1129(a)(11) requires "the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S & P, Inc. v. Pfeifer,* 189 B.R. 173, 183 (N.D.Ind.1995) (quoting *In re SM 104 Ltd.,* 160 B.R. 202, 234 (Bankr.S.D.Fla.1993)). The burden of proof to establish feasibility is on the debtor. *In re Euerle Farms, Inc.,* 861 F.2d 1089, 1091 (8th Cir.1988) (observing that chapter 12 debtor had not established he would be able to make payments under the plan); *Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters. Ltd. II),* 994 F.2d 1160 (5th Cir.1993) (reasoning that chapter 11 debtor bore the burden of proof by a preponderance of the evidence in issues related to section 1129(a)). The debtor "must demonstrate that his proposed plan is 'both realistic and will cash flow' ... His assurance toward this end must be based upon 'realistic and objective facts' (as opposed to ... overly optimistic projections) ...." *In re Alvstad,* 223 B.R. 733, 745 (Bankr.D.N.D.1998) (quoting *In re Kuether,* 158 B.R. 151, 153 (Bankr.D.N.D.1993); *In re Honeyman,* 201 B.R. 533, 537 (Bankr.D.N.D. 1996)).

On the subject of feasibility, Beal Bank offered the expert opinion of Terry Payne, and Debtor III offered the expert testimony of Pyron. Payne used the actual operating results for the year 1997 and compared these numbers only to the plan requirements for Beat Bank. Using this method, she calculated a cash flow deficit for Year One through Year Five totaling $247,506.00. Pyron did not make a comparison of anticipated income with the plan requirements, but computed his estimate of an annual stabilized net cash flow which he predicted to be $196,736.00.

As the Court's computations in Appendix A reflect, the plan requires $249,228.00 in Year One, and $248,179.00 will be required by Year Three and every year thereafter until Year Ten. Debtor III's projections indicated by Debtor III's Exhibit 12 project a net annual operating income or cash flow of $373,899.81 from June 1999 to June 2000.

Pyron, Debtor III's own witness, projects annual net income of $196,736.00 for Year One, a sum that is more than $50,000.00 short of the funds needed.[5] Appendix B is the Court's calculation of the average net cash flow using the previous twenty-seven months Debtor III has been in chapter 11. Appendix C is the Court's comparison of the plan requirements for Years One through Five with the average cash flow generated by Debtor III since the case was filed.

▌ A comparison of Debtor III's performance since filing and the post confirmation obligation to fund the plan proves that the plan is not feasible. Debtor III will have a deficit of $90,225.00 by the end of Year One and will accumulate a total deficit of $431,733.00 over Years One through Five. Debtor III will not have the ability to fund the $250,000.00 deferred maintenance program which lies at the heart of Debtor III's optimistic projection of increased cash flow.

The testimony on behalf of Debtor III's plan is that the limited partners have determined not to make any additional capital contribution. Debtor III is not able to perform the plan without increased cash flow, and there is no reasonable basis in the record to conclude that cash flow will increase without new capital to provide both deferred maintenance and capital upgrades of Phase II. Without new capital, Phase II, already an aging property, will continue to deteriorate and cash flow will further decrease.[6] As Judge O'Brien observed in a similar case:

---

5. Debtor III's counsel also asked Pyron to calculate the net income without future management fees. However, the plan does not propose to subordinate or eliminate ongoing management fees nor would it be reasonable to expect that any management company would work without compensation.

6. Significantly, Debtor III has not reduced the original principal secured indebtedness one dollar since 1984; rather, the principal debt has increased by nearly $500,000.00.

Prudent prediction of future financial performance ... is made somewhat easier because the plan does not propose significant changes in either the structure or operation of Debtor's core stores; nor does the Joint Plan call for the introduction of any new or untried business endeavor. The Joint Plan is not premised on the infusion of outside capital but the proposed reorganization is based on a downsized operation in a more limited market with focus on selected profitable stores.

*In re Consul Restaurant Corp.,* 146 B.R. 979, 984 (Bankr.D.Minn.1992).

Therefore, for these reasons, the objection to confirmation on the basis of feasibility is sustained. Debtor III has twenty days to move to convert to chapter 7 or this case will be dismissed.

IT IS SO ORDERED.

## APPENDIX A
### AT 7.64%

### DANNY THOMAS PROPERTIES III LIMITED PARTNERSHIP
### SUMMARY
### OF PAYMENTS DUE UNDER PROPOSED PLAN

### APPENDIX A

| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 |
|---|---|---|---|---|---|
| Real Estate Taxes [1] | -0- | -0- | -0- | -0- | -0- |
| Class 1 Beal Bank [2] | 169,717.92 | 69,717.92 | 188,953.56 | 188,953.56 | 188,953.56 |
| Class 2 Metro [3] | 16,220.64 | --------- | --------- | --------- | --------- |
| Class 3 Under $500 | -0- | --------- | --------- | --------- | --------- |
| Class 4 Other Unsec. [4] | 8,371.92 | 8,371.92 | -0- | -0- | -0- |
| Class 5 DT Mgmt [5] | 4,917.65 | 4,917.65 | 9,225.12 | 9,225.12 | 9,225.12 |
| Total Claims | $199,228.00 | $183,007.00 | $198,179.00 | $198,179.00 | $198,179.00 |
| Deferred Maintenance Acct. | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| TOTAL | $249,228.00 | $233,007.00 | $248,179.00 | $248,179.00 | $248,179.00 |

1 Debtor III's supplemental record establishes that the pre-petition taxes are now paid in full from escrow account at Beal Bank and Debtor III's cash.

2 Interest only due in year 1 and 2 at 7.64%. Due in years 3 – 5 are interest at 7.64% and principal amortized on 30–year basis, on principal sum of $2,221,438.30 = $15,746.13 × 12 = $188,953.56 per year. Balance is due in 120 months from effective date of plan (96th month from beginning of amortization).

3 Metro claim of $15,568.84 paid over 12 months plus 7.64% interest at $1,351.72 per month equals total plan payments of $16,220.64 in year 1.

4 Total unsecured claim of $15,481.80 paid over 24 months plus 7.64% interest at $697.66 per month equals $8,371.92 paid in year 1 and year 2.

5 Danny Thomas Company/Danny Thomas Management Company. Total claim of $64,367.16. Interest only payable in year 1 and year 2 at the rate of 7.64% per annum. Beginning in year 3 and thereafter, amortized in 120 months with interest accruing at 7.64% per annum.

## APPENDIX B

### DANNY THOMAS III
### ACTUAL OPERATING RESULTS

July 1996 – September 1998 (27 months)

| | |
|---|---|
| Gross Income | $1,016,639.00 |
| Total Expenses | ($1,243,784.00) |
| Interest Payment to Beal | + $ 409,261.00 |
| Depreciation [6] | + $ 175,431.00 |
| TOTAL CASH FLOW: | $ 357,547.00 |
| AVERAGE ANNUAL CASH FLOW | $ 158,988.00 |

6 Interest paid to Beal Bank and depreciation are expenses that are added because these amounts would be available to make plan payments post confirmation.

## APPENDIX C

PLAN REQUIREMENT:
| | |
|---|---|
| YEAR 1 | $249,228.00 |
| AVERAGE CASH FLOW | 158,988.00 |
| DEFICIT: | <$ 90,225.00> |

PLAN REQUIREMENT
| | |
|---|---|
| YEAR 2 | $233,007.00 |
| AVERAGE CASH FLOW | 158,988.80 |
| DEFICIT: | <$ 74,008.00> |

PLAN REQUIREMENT
| | |
|---|---|
| YEAR 3 | $248,179.00 |
| AVERAGE CASH FLOW | $158,988.00 |
| DEFICIT: | <$ 89,180.00> |

PLAN REQUIREMENT
| | |
|---|---|
| YEAR 4 | $248,179.00 |
| AVERAGE CASH FLOW | 158,988.00 |
| DEFICIT: | <$ 89,180.00> |

PLAN REQUIREMENT
| | |
|---|---|
| YEAR 5 | $248,179.00 |
| AVERAGE CASH FLOW | 158,988.00 |
| DEFICIT: | <$ 89,180.00> |

TOTAL PROJECTED 5-YEAR DEFICIT: <$431,733.00>