# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 00-1524/1626
_____

| | | |
|---|---|---|
| In re Danny Thomas Properties II Limited Partnership and Danny Thomas Properties III Limited Partnership, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Debtors. | * | |
| | * | |
| ------------------------------------------------ | * | |
| | * | |
| Danny Thomas Properties II Limited Partnership, Also Known as | * | |
| | * | Appeals from the United States |
| Le Marquis Apartments (Phase I), and | * | District Court for the Eastern |
| Danny Thomas Properties III Limited Partnership, Also Known as | * | District of Arkansas. |
| | * | |
| Le Marquis Apartments (Phase II), | * | |
| | * | |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Beal Bank, S.S.B., | * | |
| | * | |
| Appellee. | * | |
| | * | |
| ----------------------------------------------- | * | |
| | * | |
| U.S. Trustee, | * | |
| | * | |
| Trustee. | * | |

_____

Submitted: January 10, 2001

Filed: March 5, 2001
_____

Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and DOTY,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Danny Thomas Properties II Limited Partnership (DT/II) and Danny Thomas Properties III Limited Partnership (DT/III; collectively, the debtors) each own a portion of the Le Marquis apartment complex in North Little Rock, Arkansas. When the debtors filed separate petitions for relief under the federal bankruptcy laws, *see* 11 U.S.C. §§ 101-1330, Beal Bank, the debtors' primary creditor, objected to their plans of reorganization, *see* §§ 1101-1174.

The bankruptcy court[2] refused to "cram down" the plans, that is, to confirm them over Beal's objections, because the court found that the plans did not establish that future liquidation or further reorganization was unlikely, *see* § 1129(a)(11). *See In re Danny Thomas Properties III Limited Partnership*, 231 B.R. 298, 303-04 (Bankr.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable James G. Mixon, Chief United States Bankruptcy Judge for the Eastern District of Arkansas.

E.D. Ark. 1999). The district court[3] affirmed the decision of the bankruptcy court, the debtors appealed, and we affirm.

I.

During the late 1980s and early 1990s, the debtors experienced numerous financial difficulties that required them to restructure their loan agreements with the United States Department of Housing and Urban Development (HUD), their primary lender at the time. In 1995, Beal purchased the debtors' mortgage loans from HUD. Later that year, the debtors became financially unable to meet their obligations to Beal, and in response to foreclosure proceedings brought by Beal, they petitioned for protection pending reorganization under the federal bankruptcy laws. *See* § 1121(a). The debtors have continued to operate Le Marquis since that time as debtors-in-possession. *See* § 1107(a), § 1108.

The debtors filed reorganization plans that proposed to pay off Beal's claim, currently valued at approximately $2,220,000, based on a 30-year amortization schedule but requiring installment payments for the first 10 years and then a balloon payment for the balance. The plans also described the debtors' strategy for ensuring successful reorganization. As part of that strategy, the debtors proposed to establish maintenance reserve accounts into which each debtor would place $50,000 per year for five years to cover future maintenance costs for Le Marquis.

The debtors also included, however, so-called "drop dead" provisions in their reorganization plans as a secondary guarantor of the plans' success. In these provisions, the debtors consented to the initiation of immediate foreclosure proceedings against Le Marquis should the debtors fail to cure a default within 45 days of receiving notice from Beal of the default. In the event of an ongoing bankruptcy proceeding,

---

[3]The Honorable Stephen M. Reasoner, United States District Judge for the Eastern District of Arkansas.

moreover, the plans gave Beal the right to obtain an *ex parte* order, *see* § 362(f), granting relief from the automatic stay provisions, *see* § 362(a), of the bankruptcy statutes.

## II.

Before a bankruptcy court may "cram down" a reorganization plan over the objections of a creditor, the court must determine that the plan is "fair and equitable," *see* § 1129(b)(1). With respect to a secured creditor, such as Beal, this requirement means that the creditor must receive payments with a present value that equals the value of the secured claim. *See* § 1129(b)(2)(A)(i)(II).

The provision allowing a "cramdown" also requires that the bankruptcy court find that the plan meets various requirements specified in § 1129(a). One of these requirements is a finding by the court that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan," *see* § 1129(a)(11). This statutory provision establishes what is commonly known as the "feasibility" requirement, and as a practical matter it requires the court to find that the plan is "workable" before it may be confirmed. *See In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir. 1985).

The debtors contend that the "drop dead" provisions make the reorganization plans feasible as a matter of law. They maintain that the "drop dead" provisions amount to liquidations and that because these liquidations are contemplated within the plans, the requirements of § 1129(a)(11) are automatically met. Beal contends that the provisions do not provide for liquidations, as that term is used in the bankruptcy laws, but are merely agreements by the debtors to consent to foreclosure proceedings.

We agree with Beal that the "drop dead" provisions do not amount to liquidations for purposes of § 1129(a)(11). "Liquidation in or out of bankruptcy means

the end of a [debtor's] existence," *Maytag Corp. v. Navistar International Transportation Corp.*, 219 F.3d 587, 591 (7th Cir. 2000). The "drop dead" provisions here do not contemplate the end of the debtors' existence, but merely allow Beal to foreclose on their primary asset. It is true that foreclosure by Beal would leave the debtors as nearly-empty shells, but the debtors would nonetheless continue to exist and would be free to pursue new opportunities. The "drop dead" provisions are, therefore, more closely akin to clauses that permit a sale of assets, an action that is contemplated by the bankruptcy laws as a proper part of a reorganization plan. *See* § 1123(a)(5)(D); *see also* 7 *Collier on Bankruptcy* ¶ 1123.02[4] (Lawrence P. King ed., 15th ed. rev. 2000). Because the provisions offered by the debtors do not provide for liquidations, the language is entitled to no special significance under § 1129(a)(11), and thus the provisions certainly cannot make the reorganization plans feasible as a matter of law.

Even if the "drop dead" provisions amounted to liquidations, we could not accept the debtors' contention that providing for liquidation in the event of a default in a reorganization plan renders a plan feasible as a matter of law. Were we to do so, a bankruptcy court would be required to find that even the most implausible of reorganization plans is feasible so long as the plan provided that the debtor would liquidate if the plan failed. To require the court to confirm a reorganization plan merely because it allows future liquidation would eliminate the courts' duty under § 1129(a)(11) to protect creditors against " 'visionary schemes,' " *In the Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985), quoting what is now 7 *Collier on Bankruptcy* ¶ 1129.03[11] (Lawrence P. King ed., 15th ed. rev. 2000). We therefore reject the debtors' contention that their plans are feasible as a matter of law.

We recognize that in certain situations a plan may be rendered feasible by the inclusion of a provision similar to the "drop dead" provisions involved in this case. *See, e.g.*, *In the Matter of 203 North LaSalle Street Partnership*, 126 F.3d 955, 962 (7th Cir. 1997), *rev'd on other grounds*, *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 437, 458 (1999);

-5-

*In the Matter of T-H New Orleans Limited Partnership*, 116 F.3d 790, 803-04 (5th Cir. 1997); and *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982). Each of these cases involved a reorganization plan proposing that in the event of a default a particular asset would be sold to cover the creditor's secured claim. Rather than declaring the plans feasible as a matter of law, however, the court in each of these cases examined the facts supporting the plans and found them to be feasible because the liquidation alternative guaranteed payment of the secured claim. These cases thus fail to support the debtors' contention that the inclusion of the "drop dead" provisions makes their plans feasible as a matter of law. The debtors show merely that such provisions are entitled to be considered by a bankruptcy court when evaluating a plan's prospects for success.

III.

Having rejected the argument that the debtors' plans are feasible as a matter of law, we turn to a review of the bankruptcy court's determination that they were in fact not feasible. While a reorganization plan's "[s]uccess need not be guaranteed," *In re Monnier Brothers*, 755 F.2d at 1341, the bankruptcy court cannot approve a plan unless it has at least a reasonable prospect for success. *See id.* With respect to Beal, a secured creditor, the debtors must show, as we have said, that it is reasonably likely that the plan will result in full payment of Beal's secured claim. The debtors bear the burden of establishing the feasibility of their plans by a preponderance of the evidence. *See In re Euerle Farms, Inc.*, 861 F.2d 1089, 1091-92 (8th Cir. 1988).

We first address the reorganization plan that DT/III proposed. The bankruptcy court found that in year 1 of the plan DT/III will be responsible for an interest payment to Beal of approximately $169,700, a payment on a claim for past-due management company fees of approximately $4,900, and other miscellaneous claims totaling approximately $24,600, for a total of approximately $199,200. Combining this total with the $50,000 payment, noted earlier, that DT/III promises to make to its maintenance reserve account, the court found that DT/III will need approximately

$249,200, at a minimum, in net operating income to meet its obligations. DT/III does not seriously dispute these numbers other than to contend that the plan proposes to make no payments to the management company unless there is sufficient cash flow to do so. While the bankruptcy court questioned whether any management company would work for free, we give DT/III the benefit of the doubt and assume that it would require an approximate total of only $244,300 in net operating income to meet its year 1 obligations.

During the confirmation hearing, DT/III's own expert witness testified that DT/III's net operating income during year 1 would be approximately $196,700 if management fees resulting from year 1 operations were paid, and approximately $221,300 without payment of the fees. Even if we assume that no management fees will be paid, DT/III's projected net operating income is approximately $23,000 less than needed to fund DT/III's plan during the first year. DT/III fails to address this testimony on appeal, but instead cites other projections showing an increase in revenue based upon its belief that both rental and occupancy rates will increase.

Feasibility determinations must be "firmly rooted in predictions based on objective fact," *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985). After carefully reviewing the record, however, we believe that DT/III's projections have little basis in anything other than sheer speculation. At the very least, they do not convince us that the bankruptcy court clearly erred in accepting the testimony of DT/III's expert and concluding on the basis of that testimony that DT/III will operate at a deficit during the first year of its reorganization plan.

We also find no error in the bankruptcy court's determination that DT/III will operate at a significant loss throughout the life of its proposed plan. DT/III's initial deficit will prevent it from being able to fund its maintenance reserve account fully, thus limiting its ability to perform the maintenance required to keep the property at its current value. The bankruptcy court concluded that Le Marquis is an aging property

that will continue to deteriorate without regular maintenance, a conclusion that the record amply supports. Common sense dictates that the deterioration of the property is likely to have two important effects on the success of DT/III's reorganization plan: First, the property will probably be less attractive to potential tenants, with a resulting decrease in either rental prices or occupancy rates, and, second, as the property deteriorates it will continue to become less valuable as collateral for Beal's claim. These difficulties are likely to be exacerbated in the later years of the plan, for which a finding of feasibility is already much more difficult for a court to make because of the hazards involved in estimating future income. *See* 7 *Collier on Bankruptcy* ¶ 1129.03[11]. The failure to fund the maintenance reserve accounts fully therefore makes it highly unlikely that DT/III's reorganization plan will succeed.

We do not believe that the "drop dead" provisions of the reorganization plan can save this otherwise infeasible plan, unlike the similar provisions in *203 North LaSalle Street*, *T-H New Orleans*, and *Nite Lite Inns*, because nothing in the record indicates that Le Marquis will remain more valuable than Beal's secured claim during the life of the plan. While the bankruptcy court did not make a specific finding as to the value of Le Marquis, DT/III's reorganization plan does note that, at this time, a foreclosure sale would not bring an amount greater than the amount of Beal's secured claim. Combining this admission with the bankruptcy court's finding that the property will deteriorate, DT/III becomes unable to show that the execution of the "drop dead" provisions will fully satisfy Beal's claim. We thus detect no error in the bankruptcy court's determination that the plan was not feasible.

DT/II's reorganization plan is virtually identical to DT/III's plan. Since DT/II's plan suffers from the same infirmities as the DT/III plan does, we conclude that the bankruptcy court did not err by finding that DT/II's plan was not feasible.

## IV.

For the foregoing reasons, we affirm the judgments of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.